## McIntire *et al.* v. McConn *et al.*

1. **Will: DISPOSING MIND.** *Held,* under the evidence disclosed by the record in the present case, that the testator was of sound and disposing mind at the time of the execution of the will in question.

2. —— **UNDUE INFLUENCE.** That a will was executed at the request or through the persuasion of a devisee will not of itself render the instrument void on the ground of undue influence. The influence exerted over a testator which will defeat the will must go to the extent of destroying in some degree his free agency.

*Appeal from General Term, First District (Lee County).*

MONDAY, APRIL 11.

ACTION in chancery to set aside a will executed by one William M. McIntire, deceased. The complainants are brothers and other collateral heirs of the decedent; the defendants are McConn, the residuary legatee named in the will, and Palmer, the executor. The grounds of relief, as set out in the petition, are the want of a sound and disposing mind in the decedent, and that the will was the result of undue influence exercised by the residuary legatee upon the deceased, at the time of its execution. The District Court in the final decree declared the will void. The General Term affirmed this decision. The defendant appeals to this court.

*McCrary, Miller & McCrary* for the appellants.

*R. H. Gilmore* and *H. Strong* for the appellee.

BECK, J. — This cause was argued at great length and with very great ability by the respective counsel of the parties. Rules and principles were discussed and examined, in the light of precedents, with the view of fixing the precise line that divides that con-

1. WILL: disposing mind.

dition of mind which, in the law, is termed *sound*, and is
held to be essential to support a will, from that other
condition called *unsound*, which deprives its possessor
of capacity to dispose of his estate.   An effort was made,
in a like manner, to determine the point at which influ-
ence, exerted upon the devisor, amounts to that which is
denominated in the law *undue influence*, and, when
shown, defeats a will procured by its exercise.   A great
deal of learning and no little industry were exhibited in
the discussion which fully unfolded the difficulty of deter-
mining, by any generally accepted rules, or by the appli-
cation of legal or medico-legal principles, the boundaries
between a sound and an unsound mind, and between
allowable and undue influence.   The difficulty rests in
the very nature of the questions.   While it must be
admitted that there is a dividing line between such con-
ditions of the mind — a boundary at which the dominion
of sound reason and independent will ceases — yet it is
hard to discover and often almost impossible to trace.
The traveler, in passing from one nation to another,
speaking different languages, and having different man-
ners and customs, will observe, when he has approached
the frontier, where no great natural barrier intervenes, a
difficulty in determining to which nationality the people
belong.   Their language and customs are neither those
of the one nor the other.   He may know by this fact
that he is upon the frontier.   As he leaves it, in his
journey, he will notice that the people more and more
assimilate with the nation to which they belong, until
finally they become in no wise different.   So the explorer,
in the field of medical jurisprudence, will often find that
the boundaries of a sound and disposing mind, as the
term is used in the law, along the dominions of partial
dementia, and other lower forms of mental alienation,
can, with difficulty, if at all, be discovered from manifes-

tations of the mind itself. Like the traveler, he is assured that he is on the frontier — near the dividing line between a disposing mind and mental incapacity. Its precise place he may be utterly unable to fix   As he recedes from this line, the difficulty of determining the true character of the mind in question is lessened.   It finally exhibits such manifestations that all doubt disappears as to its true character.   The case before us is one of those that is far from this doubtful and disputed line, as will be seen upon an examination of the evidence embodied in the record.   It will therefore be unnecessary to determine where it is, or to follow counsel in their learned and industrious explorations in search of it.   In our opinion the case is one of no difficulty, and may be determined by the application of undisputed principles of law to the facts.

We will proceed briefly to state the facts as we consider they are established by the record.   We will not attempt to discuss them, nor to state the reasons of our conclusions.   It is not our habit so to do, as, in no case, can it prove profitable to the parties or to the profession.

The devisor, William McIntire, was at the time of his death about seventy-four years of age.   He was without children, and his wife had died about twelve years before. He had accumulated property and money to the amount of about five thousand dollars, more by the exercise of penuriousness than by enterprise and industry.   More than thirty years before his death he settled in Fort Madison, and lived there until after the death of his wife. His habits were all the time intemperate; he was accustomed to paroxysms of gross intoxication, becoming helpless and insensible often from the effects of his indulgences.   He would remain sober for a considerable length of time, and, when not under the influence of liquor, was considered a man of good mind and honest intentions.

After the death of his wife he became more intemperate; his fits of drunkenness becoming more frequent and continuing longer, and were accompanied by unclean and debased habits. When sober, however, his mind seemed unimpaired. One witness states, that toward the latter part of his life he seemed to have lost his mental powers to a great extent. But the evidence, by very great preponderance, satisfactorily establishes the contrary conclusion. His relations, brothers and sisters, lived in Indiana and Illinois. He visited them but twice after he removed to Fort Madison, and always exhibited to his acquaintances great indifference concerning them, amounting to absolute want of affection. He seldom mentioned them, and in conversation, when inquired of concerning them, would state that he had no relations. His last visit to them was about a year before his death. He remained with them about five months, and seemed to entertain, while in their society, proper affection and regard for them. Several of them are poor. Save in one instance, he never expressed an intention to provide for any of his relations by will. During this visit he was quite temperate.

The residuary legatee, McConn, was his intimate friend, but no ties of relationship existed between them. Their acquaintance and friendship commenced more than thirty years before McIntire's death. They were much together, and were both Irishmen. McIntire seemed to have the utmost confidence in and respect for his friend McConn, who possesses very considerable wealth.

After McIntire returned from his visit to his relations his habits of intoxication returned upon him. His last illness was probably caused partly by exposures while intoxicated and partly by the effects of his dissipation. He went into the house of a friend, Mr. J. C. Estes, who resided in Keokuk, while intoxicated or before he had become entirely sober, after one of his accustomed par-

oxysms of drunkenness, and was attacked with severe ill-
ness, which he, and probably his friends, thought was of a
rheumatic character.   He suffered great pain.   A physi-
cian was called in a few days after he was taken sick, and
attended him two or three successive days.   The evi-
dence of this physician is before us.   He states that the
disease was of a paralytic character, caused by dissipation
and age.   He describes the patient as being in a comatose
state, and expresses the opinion that he was not, at the
time, of sufficiently sound mind to transact ordinary busi-
ness.   It does not appear that he made any examination
of his patient with the view of forming an opinion as to
his condition of mind, nor that he made any effort to
engage him in conversation.   He had never before known
McIntire, and at the time made no notes or memoranda
of his symptoms or of the remedies prescribed.   His evi-
dence was given about two years afterward.

Another physician was called to see him a day or two
before his death, and after the will had been executed.
This was as much as five weeks after he was visited by
the first-named physician.   He was fast sinking when
seen by the second physician, and Mr. and Mrs. Estes, in
whose house he died, testify that he died within eighteen
hours, but the physician thinks he lived longer.   His
disease is described by the last-named physician much
the same as it 'is by the first, except that it had assumed
somewhat the character of hemiplegia.   He also expresses
the opinion that the patient's mind was in such a condi-
tion that he was unfit to transact ordinary business; but,
as in the case of the other physician, he made no exami-
nation into the condition of his mind, and made no notes
or memoranda of the symptoms of the patient's disease
and remedies used.   His evidence was also given about
two years after McIntire's decease, with whom he had no
acquaintance prior to being called to visit him during his

last illness. No other witness expresses the opinion, that, during his sickness, prior to and at the time of the making of the will, McIntire's mind was unsound, or that he was incompetent to execute the will. On the contrary, both Mr. and Mrs. Estes, at whose house he died, very explicitly say that his mind was not impaired at any time until after the will was executed, and that when it was executed he was possessed of his right mind. These witnesses were well acquainted with him, and had been for years. They constantly attended him in his last illness, and he had often visited at their house; Mr. Estes had been his partner in business; they knew him intimately. If their evidence exhibits any bias it is against the defendants; they certainly exhibit feeling in favor of plaintiffs. They undoubtedly, however, testify frankly and truthfully. We find in the record support for their evidence upon this point, which it is not necessary to state at length.

It is claimed the evidence discloses that the will was procured through undue influence, exercised by McConn over the devisor at the time of its execution. McConn was present when the will was drawn and signed. He came at the request of Mr. McIntire, conveyed in a letter written by Estes. When he arrived McIntire informed him that he desired to make his will, and he, with Mr. Estes, procured the attendance of an attorney to draw the instrument. The plaintiffs insist that the bequest to McConn was made upon his request. Their theory is, that, after the other provisions were written, McIntire said that he desired nothing further to be written, but that McConn asked him to whom he desired the balance of his property to be given — whether to himself, McConn, or to some other person — and that in reply to this question he directed the provision to be written making McConn the residuary legatee. We do not think that the evidence supports this view, but that

<p style="margin-left:2em; font-size:smaller;">2. —— undue influence.</p>

the preponderance is clearly against it. We are of the opinion that the bequest was made to McConn without his suggestion, and even against his remonstrance. But, however this may be, it does not follow, that, if the bequest was made upon the request of McConn, or even through his persuasion, it is for that reason void. The influence exercised over a testator, which will defeat the will, must go to the extent of destroying, in some degree, his free agency. *Miller* v. *Miller*, 3 Serg. and Rawle, 367; *Blanchard et al.* v. *Nestle*, 3 Denio, 37; *McDaniel* v. *Crosby et al.*, 19 Ark. 533; *Harrison's Will*, 1 B. Mon. 351. See also 1 Jarm. on Wills, 37, and authorities cited.

Considering the evidence in the strongest light in which it is viewed by plaintiffs' counsel, it does not show that the testator's will was overridden, or his free agency in any degree affected by the request or conversation of defendant McConn. The contrary rather appears. It is shown, that, after the execution of the will, when McConn was not present and probably had returned to his home, McIntire expressed his gratification that the will had been executed, and his satisfaction with its provisions. It cannot be claimed that he was then under McConn's influence. We are satisfied that the will was the result of the exercise of a competent and disposing mind, and was not obtained through undue influence.

The decision of the General Term is reversed, and a decree will be entered in this court dismissing the petition of plaintiffs.

<div align="right">Reversed.</div>