REBECCA PERKINS, Proponent, v. M. V. PERKINS AND B. F. PERKINS, Appellants.

**Wills: MENTAL CAPACITY.** The fact that a testator is old and enfeebled, and that his mental powers and memory are impaired,
1 and that he cannot transact business as formerly or that he may not be able to make contracts, or transact business gen-
2 erally does not constitute such want of capacity, as will invalidate his will, if he has sufficient mind to understand the na-
3 ture of the instrument, to recollect property, the object of his bounty, and the manner in which he wishes to distribute his property.

| | |
|---|---|
| 116 | 253 |
| 120 | 42 |
| 120 | 345 |
| 116 | 253 |
| 128 | 500 |
| 128 | 623 |
| 116 | 253 |
| 129 | 99 |
| 116 | 253 |
| 131 | 490 |
| 116 | 253 |
| f133 | 684 |
| 116 | 253 |
| 134 | 35 |
| 116 | 253 |
| 137 | 617 |
| 137 | 618 |
| 116 | 253 |
| 138 | 332 |
| 116 | 253 |
| 139 | 233 |
| 139 | 238 |
| 142 | 43 |
| 116 | 253 |
| 144 | 587 |

EVIDENCE:   *Exclusion of heirs.*   The exclusion of all or part of testator's legal heirs from the benefits of the will is not sufficient evidence of lack of a disposing mind.

*Remarriage in old age.*   The fact that a man remarries at the age of 69 years is not evidence of insanity, in a suit to set aside a will subsequently made.

*Harmonious wills.*   The fact that wills executed by a testator before his last sickness named his wife as sole beneficiary, is evidence, in a contest over a similar will executed in his last sickness, that testator had a deliberate and intelligent purpose to make her his sole beneficiary.

*Undue influence.*   The fact that a will which devises testator's property would not have been made except at a request, does not show undue influence sufficient to invalidate the will, but there must be influence operating to cause the execution of the will which subordinates testator's will to the will of the person exercising the undue influence.

*Same.*   Evidence that a wife requested a third person to attempt to induce her husband to devise his property to her is strong evidence that the husband was not unduly subject to her influence.

UNSUCCESSFUL ATTEMPT TO PROBATE:   *Costs.*   A person named in a will as executor is not, in the absence of good faith, chargeable with the costs of an attempt to probate the will, which is contested, even though probate is denied, as it is her duty to offer it for probate.

*Appeal from Warren District Court.*—HON. J. H. APPELGATE, Judge.

THURSDAY, APRIL 10, 1902.

A PAPER purporting to be the will of Edward Perkins, deceased, being offered for probate, its admission was contested by the defendants, who are the sons of the testator. Trial to a jury, verdict for the defendants, and plaintiff appeals.—*Reversed.*

*O. C. Brown* for appellant.

*Henderson & Berry* for appellees.

WEAVER, J.—Edward Perkins died February 19, 1897. He had been twice married. His children, who survive him, were all the fruit of the first marriage, of mature age, and settled in separate homes of their own. He had been an active, energetic man, and accumulated a moderate property, which before his death had been somewhat reduced by an unprofitable experience as a country merchant. At the time of his death the value of his estate is variously estimated at from $2,000 to $4,000. His first wife died March, 1891, and within a few months thereafter he married the plaintiff. This marriage was evidently distasteful to his children, and the relations between them and their father were thereafter somewhat strained, though not entirely hostile. At the time of the second marriage he was about 69, and the plaintiff about 48, years of age. An antenuptial contract was entered into between them, by which the interest of the survivor in the property and the estate of the other was limited to a life estate. On March 1, 1892, by a writing jointly executed by them and entered of record, the antenuptial contract was annulled and cancelled of record. During the last few years of his life Mr. Perkins' health became somewhat broken, although continuing in active charge of his business. In November, 1896, in apparent realization that his death could not long be postponed, he made a will, by which, after providing for the sale of a certain tract of land for the payment of debts and discharge of liens, he gave the remainder of his estate to his wife. About February 5, 1897, he called in the person who had written this will, and executed another, identical in form with the first, except the insertion of a clause therein giving to his children, naming them the sum of $1 each. Ten days later, and four days before his death, he again called the notary, and expressed a wish to appoint his wife as executor in place of the person formerly named for that trust, and, being advised to make a new will instead of amending the old

one, another was drawn and executed, making the same dispositions of his property as before. The instrument last mentioned is the one tendered for probate. The contest is based upon two allegations: (1) That at the time of the execution of said will Edward Perkins was of unsound mind, and incapable of making a valid will: (2) that the execution of said will was procured by fraud and undue influence, exercised over the testator by his wife, Rebecca Perkins. This controversy was before this court upon a former appeal, and is reported in 109 Iowa, 216. Judgment upon a verdict for the defendant was there reversed, and in remanding the case for a new trial it was said: "If the contestants have no other or different evidence from that adduced upon the trial in the district court, they will save themselves trouble and expense by withdrawing their objections to the probate of the will." Accepting this suggestion, three of the contestants withdrew further opposition, but the other two, proceeding to a new trial, obtained a verdict, and are again here as appellees. Is their verdict sustained by any other or different evidence than was before us on the former appeal? We are compelled to say it is not. It is true several new witnesses were examined on behalf of the contestants, but their testimony is in no proper sense other or different than was produced on the first trial. Many of the matters sworn to by these witnesses are of a trivial an inconsequential character; nor is any of it so inconsistent with the existence of sound mind and freedom of will in the testator as to justify a verdict rejecting his will. We will briefly advert to the two propositions presented by the contest:

I. As to the alleged want of testamentary capacity in Edward Perkins at the date of the will: Of the 29 witnesses produced by the contestants, 12, including old neighbors, acquaintances, and members of the family, do not attempt to express any doubt of his soundness of mind. Of the other 17, nearly all speak with much apparent caution, or so qualify and explain

the opinions expressed as to afford no ground upon which this objection to the will can be sustained. They tell that he seemed to change somewhat with increasing age; that as his physical strength waned there was a perceptible weakening of his mental vigor; that he was at times forgetful; was childish; got into many lawsuits; when speaking of the probability of approaching death, shed tears; was not on as pleasant and affectionate terms with his children as formerly; became confused in attempting to compute interest on a note; on the day before the will was made (as one witness testifies) he failed to recognize an old acquaintance; in the night after the will was made he was in a semi-comatose condition. These things, and a few others more or less irrelevant, make up the defendant's case. Giving it all credence, is it sufficient to overthrow the presumption of sanity which the law raises in favor of the testator? Several of the witnesses were permitted to say that in their judgment the testator was not capable of making a valid will. Waiving any question as to the propriety of this kind of testimony, a full reading of the record discloses how worthless it is in the present case. While, as every lawyer knows, a man may be capable of making a good will after he is so far gone into imbecility and mental darkness as to be no longer capable of making a valid deed or of transacting business generally, the very opposite conclusion seems to pervade the lay mind, and the making of a will is, to its apprehension, the one item of business which requires the presence of all one's faculties in their normal strength. Of the witnesses expressing their opinion as to Mr. Perkins' incapacity, not one undertakes to pronounce him insane. For example: J. W. Burkhead, who thus answers further, says, "I testified I did not hardly think he was competent to make a will, but did not mean to say that he could not attend to business in a general way." John H. Thomas, who gives it as his judgment that "for the last two years or three years of his life" he was not of sufficiently sound mind to make a will, admits

that, so far as he could observe, Perkins "attended to the ordinary transactions of life, and, by himself and through his agents, looked after his matters, collected his interest, bought property and superintended his matters in general." Theodore Young says, "I knew he had been loaning money, making collections, attending to his own affairs, and seemed to be able to do so." H. P. Shepard says, "His condition was like most old men * * *. The difference or change I noticed in his business faculties was the difference between an old man 75 or 80 years old and one of 35 or 40 or 50 years * * *. If Mr. Perkins was not sick, he was as competent to make a will as any man 75 or 80 years old." B. S. Burkhead, who gives an unfavorable opinion of his condition to make a will, also says, "I think in ordinary matters he could attend to them all right. * * * I think he would have been able to remember his wife and children, and had knowledge of his property." Dr. Baker, whose first visit to the testator was on the night after the will was made, says that during his visits the testator was not in condition to transact business, but also says that he may have been competent during the day when the will was made, and "may have been competent up to a few hours before I saw him." The most that Mr. J. T. Meek says is that the "old man was pretty badly knocked out, and was not near the man he was in an earlier day." David Lockridge, who transacted business with him in January before his death, and thinks "he was not capable of doing business," says, "He was in pretty bad shape,—I mean he was a pretty sick man. He would have done it all right if he had been in health," James W. Durham, who visited Mr. Perkins a week or so before his death, and saw him sit up in bed and undertake to compute interest on a note, but, becoming confused, called for assistance, says, "The old man was pretty weak in body and I think myself his mind was not so strong as it might be. He was weak in body, and it seemed like when he tried to do any kind of business it kind of worried him.

In some things his mind seemed to be all right, but it seemed that he was not strong enough in his mind to do business that worried him." J. N. Jenks who visited the sick man on the day the will was made, and thereafter every day until his death, says, "The old gentleman sent for me. * * * He was in bed, very weak. He told me he was going down all the time, and was weak bodily and in mind, but I thought his mind was very good for a man of his age and this sickness that he had. His mind was pretty fair according to that. * * * He was able to carry on conversation, and seemed to know what we were talking about." Belle Jenks says of his mental condition when she met him in October and December of 1896, "He appeared to be a man of average mind; very good; taking into consideration his age and sickness. Saw him on Monday before his death. So far as I could see, he was able to understand and know what was going on. Saw him also on Tuesday, Wednesday and Thursday. I think he understood matters and things when he was roused up. I know he did." These quotations are made from the testimony of the principal witnesses called by the contestants. They show the fatal weakness of the objections made to the testamentary capacity of Mr. Perkins.

The right of a man to dispose of his property by will as he sees fit is one which the law is slow to deny. No mere weakening of his mental powers—no mere impairment of the faculties—will invalidate a will executed in due form, so long as he retains mind enough to know and comprehend in a general way the natural objects of his bounty, the nature and extent of his estate, and the distribution he wishes to make of it. It is not necessary that he should be competent to make contracts, or to transact business generally. *In re Convey's Will,* 52 Iowa, 197; *Meeker v. Meeker,* 74 Iowa, 357; *Howell v. Taylor,* 50 N. J. Eq. 428 (26 Atl. Rep. 566); *Bennett v. Bennett,* 50 N. J. 439 (26 Atl. Rep. 573). Old age and failure of memory do not of themselves

necessarily take away a testator's capacity to make a will. *Whitenack v. Stryker,* 2 N. J. Eq. 8.   His mind may have become debilitated by age or disease, the memory enfeebled, the understanding weak, he may even want the capacity to transact many of the ordinary business affairs of life; but if he has mind enough to understand the nature of the instrument he is executing, to recollect the property he means to dispose of, the objects of his bounty, and the manner in which he wishes to distribute it among them, he has testamentary capacity.   *Kerr v. Lunsford,* 31 W. Va. 659 (8 S. E. Rep. 493, 2 L. R. A. 668).   See, also, to the same general purport, *Webber v. Sullivan,* 58 Iowa, 260; *Rice v. Hall,* 120 Ill. 597; *Silverthorn's Will,* 68 Wis. 372 (32 N. W. Rep. 287); *Delafield v. Parish,* 25 N. Y. 22; 1 Redfield, Wills, chapter 4, sections 5-7.   The exclusion of some or all of legal heirs from the benefits of a will is not sufficient evidence of incapacity.   *Collins v. Brazil,* 63 Iowa, 434; *Denning v. Butcher,* 91 Iowa, 425.   It is unnecessary to prolong the citation of authorities.   The rules announced are elementary, and grounded in reason and justice.

This case, like too many other will contests, grows out of the fact that a man of somewhat advanced age, and having children by a former marriage, saw fit to exercise his right to marry a second time. Children under such circumstances are apt to look upon the new wife as an intruder, and to regard the possibility of her sharing in their father's estate with displeasure. They see no reason why he should not have shown his loyalty to their mother's memory by remaining unmarried for the remainder of his life, though, in all probability, not one of them will fail to do the very thing which they condemn in him if time and opportunity bring them to the same extremity. When such a man dies and leaves a will by which his second wife receives more than the strict portion which the statute gives her, the jealousies and dislikes aroused by her entrance into the family make it easy for the children to imagine that she had imposed upon their father's weakness

to their injury and the very fact that they are cut off, in whole or part, from his bounty, is to them an all-sufficient reason for believing he was of unsound mind.   But it will scarcely do to say that the fact that an old man marries is proof of his insanity.   All history shows that the mating instinct does not necessarily wane with advancing years; and if wedlock be the blessed state of which orators, esayists and poets assure us, why should it be thought an imputation upon one's soundness of mind that, when left alone in his old age, he turns to it again for comfort and happiness?   By the death of his first wife, Mr. Perkins was left alone.   While his children would, doubtless, have given him place at their own firesides, such an expedient involved the necessity of breaking up his home and adjusting himself to the habits and customs of a family in which he would be a boarder rather than master and head. It is natural that he should shrink from this radical change in his ways of life, and should marry again.   The woman whom he selected gave him the care and attention he needed, kept his home in order, nursed him in his sickness, had but very small means in her own right; and if in disposing of the remnant of his property he preferred her to the children who had long before left his roof for their own, who shall say that his act was not in a high degree both sane and just?

II.   As to the allegation of undue influence: This objection, is supported by testimony which is, if possible, even less persuasive and satisfactory than that which is offered to show the testator's mental incapacity.   The testimony of certain witnesses tends to show that on different occasions during the years from 1891 to 1897, Mrs. Perkins expressed dissatisfaction with the state of property matters between herself and husband, and asked the witnesses to speak to him about it, or to suggest to him the advisability of conveying or deeding the property to her.   Aside from these statements, there is nothing whatever to show any direct or indirect effort upon her part to influence him in the dispo-

sition of his estate. She was not present at the execution of either of the three wills made in her favor. There is not the slightest testimony that she knew or directed or controlled the form or substance of either instrument. The concensus of opinion of all the witnesses is that Edward Perkins was a man in whom self-will approached the character of obstinacy; that he was independent, self-reliant, and not easily driven or persuaded into anything which was counter to his own inclinations. Notwithstanding the approach of age, with its inevitable weaknesses and disadvantages, he held in his own grasp the management of his business and the control of his property until the day of his death. Save for the wifely offices attended to by her in and about the sick room and home, there is no evidence that he was especially dependent upon her, nor is there any showing of any kind that she took advantage of his weakened condition to bring his mind or will into subjection to her own. Assuming the truth of all that is said by the witnesses as to her requests for their intervention in her behalf, it has a strong tendency to show that her husband was not unduly subject to her influence. Even were it clearly shown that she did request him to make the will in her favor, and that he would not have made it but for her importunity, it would still be insufficient ground for setting it aside. To be undue, within the meaning of the law, influence must be such as subjects the will of the testator to that of the person exercising such influence, and makes the paper express the purpose of such person rather than that of the testator himself. It must be equivalent to moral coercion. *Will of Carroll,* 50 Wis. 437 (7 N. W. Rep. 434); *McIntire v. McConn,* 28 Iowa, 480; *Allmon v. Pigg,* 82 Ill. 149 (25 Am. Rep. 303); *Brownfield v. Brownfield,* 43 Ill. 147; *Robinson v. Stuart,* 73 Tex. Sup. 267 (11 S. W. Rep. 275); *McCulloch v. Campbell,* 49 Ark. 367 (5 S. W. Rep. 590); *Norton v. Paxton,* 110 Mo. Sup. 456 (19 S. W. Rep. 807); *Thompson v. Ish,* 99 Mo. 160 (12 S. W. Rep 510, 17 Am. St. Rep. 552). And such

undue influence must be directly connected with the execution of the will, and operating at the time it was made. *McCulloch v. Campbell, supra; Pooler v. Cristman,* 145 Ill. 405 (34 N. E. Rep. 59). No such influence is shown to have been possessed or exercised by the proponent in this case, and a verdict sustaining the objection based upon such alleged ground cannot be upheld. Indeed the testimony is abundant that with the closing years of his life the testator came to feel that it was his duty to make special provision for his wife. His children were absorbed in their own families and homes, and his wife was admittedly faithful in caring for him and his household. He often spoke of her kindness and service in an appreciative manner, and repeatedly stated to witnesses, not in her presence, that he intended to give her his property, and that he had already done all he thought he ought to do for his children. The fact that each of the three wills executed by him was in her favor, and that the first was made before taking to his deathbed, is also strongly significant that it was his deliberate and intelligent purpose to make her the sole beneficiary of his bounty.

III. The taxation of costs to the proponent by the district court was error. There is no evidence tending to show that the will was presented for probate in bad faith. As the executor of the instrument, it was proponent's duty to file it in court, and to procure probate thereof, if the facts were found to justify it, and, even though probate was refused, she was not chargeable with costs. *Meeker v. Meeker, supra.*

Others errors assigned are upon matters not likely to again arise, and we will not take time for their consideration.

The judgment below is REVERSED.