IN RE ESTATE OF ROBERT AYERS.

ARTHUR C. DAILEY ET AL., APPELLEES, V. CHARLES
TREADWELL ET AL., APPELLANTS.

FILED MARCH 20, 1909. NO. 15,526.

1. **Wills: PROBATE: EVIDENCE.** Where a witness to a will testified that another witness and himself signed the will at the request of the testator, such testimony will not be disregarded on appeal because in the form of a conclusion, no objection on that ground having been made at the time.

2. ———: PUBLICATION. Where the evidence shows that the witnesses to a will signed the same at the request of the testator, who thereupon directed the draftsman thereof to place the same in an envelope addressed to the county judge, in whose office it was afterwards found, such acts constitute a sufficient publication of the will.

3. ———: DOMICILE. Evidence examined, and found insufficient to show a change of residence.

4. ———: TESTAMENTARY CAPACITY. Where it appears that a testator had been on various occasions temporarily confined in a hospital for the insane, but in the intervals was competent to transact with judgment and discretion his ordinary business, and had sufficient strength of mind and memory to know and comprehend and retain in his mind those who were or naturally should have been the objects of his bounty, the nature and extent of his estate and the distribution he wished to make of it, and that during such an interval he executed in due form his last will and testament making a reasonable distribution of his estate, a judgment probating said will should be sustained.

5. **Appeal: HARMLESS ERROR.** It is not error for a district judge to refuse to hear argument where an examination of the evidence discloses the fact that the conclusion arrived at was the proper one.

APPEAL from the district court for Clay county: ED L. ADAMS, JUDGE. *Affirmed.*

*Charles H. Sloan, Paul E. Boslaugh* and *John A. Moore,* for appellants.

*Thomas H. Matters, contra.*

CALKINS, C.

Robert Ayers died at Omaha, Nebraska, August 1, 1906, a widower and without issue, leaving him surviving his sole heirs at law Charles Treadwell and Ezekiel Ayers, brothers, and Kate Addis and Fanny Inglis, sisters. He died seized of about $1,000 in personal property and an 80-acre farm in Clay county, where he had resided for many years. In 1892 he executed and deposited with the county judge of Clay county an instrument purporting to be his last will, which was in the words and figures following:

"I, Robert Ayers, of Clay county, Nebraska, being of sound mind, memory and understanding do hereby make my last will and testament in manner and form following:

"First. If my beloved wife, Kate E. Ayers, be living at the time of my death, I give, devise and bequeath to her all the real and personal property belonging to me wherever the same may be at the time of my death.

"Second. Should my wife, Kate E. Ayers, die previous to my death or before the proving of this will, it is my desire that after paying all just debts by me owing, that my property both personal and real be given to my niece, Gussie M. Inglis, daughter of my sister Fannie, wife of Alix Inglis of Victoria, Knox county, Ill.

"In Witness Whereof, I, Robert Ayers, the testator, have to this my last will and testament set my hand and seal this 22d day of February, 1892.

"ROBERT AYERS.   (Seal.)

"Signed, sealed, published and declared by the above named Robert Ayers as and for his last will and testament in the presence of us who have hereunto subscribed our names at his request as witnesses hereto in the presence of the said testator and of each other.

"L. S. BACKUS, of Harvard, Nebraska.
"EZRA BROWN, of Harvard, Nebraska."

The probate of this will was contested by the sister Kate Addis and the brothers Charles Treadwell and Ezekiel Ayers. The county court overruled their objections to the will and admitted it to probate, and, an appeal being taken to the district court, a trial was had to the judge without a jury. Upon his finding in favor of the proponents the will was admitted to probate, and from this judgment the contestants appeal.

1. The first objection of the contestants is that the will was not properly executed and attested. From the copy above given it appears that there was an attestation clause thereto attached, which certified that the will was signed, sealed, published and declared by the testator as and for his last will and testament in the presence of the witnesses, who subscribed their names at his request, in the presence of the testator and of each other. It appears that the witness Backus died before the proving of the will; but the other witness, Ezra Brown, was present at the trial and testified that he acted as draftsman of the will. Upon presentation and identification of the paper by him, he having testified that he recognized the same, the following examination was had: "Q. In whose hand writing is that paper except the signatures that are attached? A. I wrote the paper. Q. At whose request? A. At Mr. Ayers request. Q. Did you see him sign it? A. I did. Q. And did he see you affix your signature there? A. Yes; and Mr. Backus also. Q. That was done at his request? A. That was done at his request and in his presence."

The contestants admit that in other jurisdictions and in a dictum by this court the rule is stated to be that, where the attestation clause recites all the requirements of due execution and attestation, it will be presumed *prima facie* that all the requirements existed. It is, however, insisted that this rule would be in violation of section 141, ch. 23, Comp. St. 1907, which provides that, in case there shall be no contest to the probate of a will, the county court may grant probate thereof on the testi-

mony of one of the subscribing witnesses only, "if such a witness shall testify that such will was executed in all the particulars as required in this chapter, and that the testator was of a sound mind at the time of the execution thereof." We do not think it necessary to determine this question. The testimony of the surviving witness we think established each and all of the facts recited in the attestation clause.

The contestants argued that the testimony of Mr. Brown that Backus signed at Mr. Ayers request is to be disregarded as being a conclusion of the witness. There was no objection to the form of the question which elicited this response, nor to the answer, at the time, and we do not understand the rule to be that the court may disregard testimony when it is received in that form without objection.

2. It is said that the evidence fails to establish a publication of the will, and it is true that we do not find any statement in the testimony that the testator declared he published the will. Publication, as the term is used in the law of wills, is the act or acts of the party by which he manifests that it is his intention to give effect to the paper as his last will and testament, and any communication indicating to witnesses that the testator intends to give effect to a paper as his will by word, sign, motion or conduct is sufficient in law to constitute a publication. *In re Claflin's Will*, 73 Vt. 129, 87 Am. St. Rep. 693. In this case the evidence shows that the witnesses signed the will at the request of the testator, and that the draftsman of the will, at the direction of the testator, placed the same in an envelope addressed to the county judge, and that the same was afterwards found in the office of the county judge in that envelope, bearing the marks of the post office, showing that it had been sent through the mail. We think the request of the testator to the witnesses to sign and the steps taken by him to have the will deposited with the county judge sufficiently show his intention to give effect to the paper as his will.

3. It is urged that the deceased was not a resident nor inhabitant of Clay county at the time of his death, and that the county court of Clay county had no jurisdiction to probate the will. It appears that the deceased moved to Clay county from Illinois when he was about 26 years old; that he purchased land which he continued to farm either by himself or tenants up to the time of his death; that about three or four months before his death he went to Omaha and lived in a boarding house, which he left to go to the hospital. He had a trunk and a bicycle with him. The landlady of his boarding house, being called as a witness, testified as follows: "Q. While living at your place did he speak of that as his home? A. Yes. Q. Did he during that time state to you what and where his home was? A. Yes; Clay county. Q. No; I mean while he was with you. A. Well, no; he didn't say. He lived in Omaha and stayed here, and he called my house his home. Q. While he was there? A. Well, that was just about after he had been there a month. Q. And did he speak of that as his home only once? A. Just once that I talked to him." Similar testimony was given by the landlady's assistant, but we do not think it sufficient to establish any intention to permanently abandon his residence in Clay county. It appears that he left his money on deposit in Clay county, and it does not appear that he moved therefrom any of his property except his trunk and bicycle. The evidence clearly supports a finding that he was a resident of Clay county.

4. The principal contention of the contestants, and one argued with great earnestness and insistence, is that there was not sufficient evidence to sustain the finding of the district court as to the testamentary capacity of the deceased. It appears that Robert Ayers was born in Illinois, and lived there until about 26 years of age, when he moved, with his wife, whom he had married in Illinois, to Clay county, Nebraska, where he purchased a farm. He displayed mental peculiarities as a boy. When about 20 years of age he was committed to an asylum for the insane

in Illinois. He was released from this confinement, and returned to his father's home, where he remained until June, 1879, when he was again taken to an asylum, from which he was released in about a year. He returned again to his father's, married, and soon after moved to Nebraska. In January, 1888, he was sent to the Nebraska hospital for the insane, from which he was paroled September 24, 1890, and finally discharged January 28, 1891. On March 26, 1892, he was again sent to the insane hospital. It does not appear from the record whether he was paroled from this commitment, but the final discharge appears to have been dated March 9, 1894. On February 18, 1897, he was again committed, and his final discharge from this commitment was dated October 5, 1901. In March, 1903, he was again committed and was again discharged October 4, 1905. It appears that conservators of his property were appointed from time to time as he was committed to the asylum, and that upon a discharge and return he would settle up with such conservators and resume the dominion over his property and the conduct of his business. The history of the recurrence of these attacks contained in the record is not very precise, and does not clearly establish their cause; but the use of intoxicants is associated with them, and undoubtedly exacerbated the mental disorder. After the restraint imposed upon him and the treatment given in the hospital, his condition would improve until he was fitted to follow his ordinary vocations and attend to his usual business affairs, although it is probable in the light of the entire history of his case that he never absolutely recovered from the malady with which he was afflicted.

The contestants produced a formidable array of witnesses, boyhood acquaintances of the deceased, his sister and brother, officers who had had charge of him while under restraint, and one or two medical witnesses beside Dr. Hay, then superintendent of the Nebraska insane hospital. The testimony of the latter was that he believed from the history he had of the case that the deceased in-

herited a strong predisposition to insanity; that he, without any apparent cause, had an attack of acute insanity in early life, and partially or wholly recovered, and had another attack, which was followed by others until he had in all five or six distinct attacks of acute insanity, in which he was either in a state of melancholia or a state of acute or subacute mania; that between these attacks there was a certain degree of sanity, but, judging from the character of most cases like his, the doctor asserted that after one or two attacks of acute insanity his mind was so weakened that he was never, probably, in a normal state after his first, second or third attack of that kind; that his disease was a form of periodic insanity called melancholic depressive insanity, which is an incurable constitutional disease. A long hypothetical question reflecting his life history as it was established or tended to be established by contestants' evidence was propounded to the doctor, who gave in answer thereto the opinion that, while he would not speak positively as to the whole period, the deceased was certainly insane the greater portion of the time.

On the other hand, the proponent produced the testimony of the scrivener of the will, of the men who had been appointed conservators for the deceased when he was sent to the hospital, and neighbors and acquaintances who knew him more or less intimately at about the time of the execution of the will, the consensus of whose testimony was that he understood business affairs and was perfectly capable of transacting business.

There is nothing in the record to show that his business ability or his understanding of business matters and affairs was ever directly affected even during the acute attacks. On the contrary, he seems to have always been accurate in his business methods, and careful and intelligent in his business transactions. Even at the last, while he was in Omaha, and when, as the testimony of his landlady tended to show, there were increasing aberrations of conduct which probably marked the progress

of his disease, he was careful and accurate about his
business transactions and capable of taking care of his
business interests.   She testified that he insisted upon
having his board at a low price, and that he never forgot
the date at which he began to board there nor when his
payments were due, but invariably met the same accord-
ing to his contract.   The testimony of the contestants'
witnesses was directed to the point whether they con-
sidered him sane or insane, but not to whether he had
sufficient mental capacity to comprehend the nature of,
and conduct with ordinary prudence, business transac-
tions.   Even his sister, who contests the will, and testi-
fies to the opinion that he was insane, upon the death of
his mother purchased his interest in the land of his
father, which had been set aside as his mother's dower,
taking his deed therefor, which was dated on the 2d day
of April, 1891.   If she understood insanity to mean a
manifestation of a disease of the brain characterized by a
partial derangement of one or more of the faculties of
the mind, but which left her brother capable of looking
after his business interests and transactions, then her
testimony is consistent with her conduct; but, if she be-
lieved or meant that his mental faculties had been im-
paired to the extent that he was unable to properly care
for his business interests, her conduct is altogether in-
consistent with her testimony.

This brings us to the crux of this case.   The medical
definition of insanity as given by Dr. Hammond in his
work on Diseases of the Nervous System is a manifesta-
tion of disease of the brain characterized by a general or
partial derangement of one or more of the faculties of the
mind, in which, while consciousness is not abolished,
mental freedom is perverted, weakened or destroyed.
That, pathologically considered, the deceased was insane
for many years may be admitted; but the real question
is:   Was his mind so diseased that his mental freedom
was perverted and his understanding destroyed so that
he was incapable of knowing and comprehending in a

general way the natural objects of his bounty, the nature and extent of his estate and the distribution he wished to make of it. The older view regarded the human mind as a single indivisible potency not comprising distinct functions, and consequently that any impairment thereof must be absolute, and not partial. But modern medical science recognizes, as shown by the definition above quoted, that there may be a partial derangement of one or more of the faculties of the mind, leaving others practically unimpaired, and hence arises what is called partial insanity. This court has laid down the rule that, where the insanity is not general, the question to be determined is whether the subject was the victim of such delusions as controlled his actions and rendered him insensible to the ties of blood and kindred. *McClary v. Stull*, 44 Neb. 175. A very full discussion of the degree of soundness of mind required for the making of a valid will and a full citation of authorities will be found in the case of *Perkins v. Perkins*, 116 Ia. 253. The law makes no distinction between mental incapacity whether congenital or caused by age, sickness or disease, and it therefore follows that partial insanity does not necessarily disqualify a testator from making a valid will. Some courts have gone so far as to say that, when there is nothing unreasonable on the face of the will by one habitually insane, it will be presumed to have been made in a lucid interval. *Kingsbury v. Whitaker*, 32 La. Ann. 1055, 36 Am. Rep. 278. In this case there was nothing unreasonable upon the face of the will. He gave all his property to his wife if she should survive him. He had no children, and his next of kin were brothers and sisters. What his relations were with the mother of the niece whom he made his beneficiary or with his brother Ezekiel does not appear; but the other sister and brother testified in the case, and, judging from their testimony, there was nothing in their conduct toward this brother to keep alive fraternal affection or to cause them to be held in gentle remembrance by him. No reasons appear except

the tie of blood from which it could be argued that he was under any obligation to any of his brothers or sisters, and we do not therefore regard it as strange nor unreasonable that he selected this niece as the sole subject of his bounty.

There is a charge of undue influence, and the contestants complain of the rejection by the court of certain testimony of Mrs. Addis that Mrs. Ayers was embittered against her, the theory being that Mrs. Ayers influenced her husband to make a will hostile to Mrs. Addis. We think, if we assume that Mrs. Ayers was unfriendly to Mrs. Addis, the theory that she influenced her husband would have no support whatever. The only thread upon which this supposition is hung is that Ayers stated to the scrivener when he had drawn the will that his wife would now see that he had kept his word. This remark is fully explained by the fact that he had made a will in his wife's favor, and it is more likely that he referred to some promise of that kind than to the contingent remainder which he left to the niece.

5. Finally, the contestants complain that the district court erred in declining to hear argument. While we think it better that the judge trying a case should observe the admonition which he often gives to jurors not to make up their minds or form an opinion until they have heard all the evidence and arguments of counsel, we do not see how it could be reversible error upon an appeal to this court, where the question is whether the decision upon the evidence was right. Perhaps the fact that the trial judge declined to hear argument should take away some of the weight which a court of error is accustomed to give to his decision upon the facts, yet we do not think it should reverse the case unless we were satisfied that his decision upon the facts was wrong. We have read the printed and listened to the oral arguments of counsel, and after a patient reading of all the testimony we are satisfied that the decision of the district

court was right, and that his refusal to hear argument, if wrong, was error without prejudice.

We therefore recommend that the judgment of the district court be affirmed.

DUFFIE and GOOD, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.

EPPERSON, C., not sitting.