IN RE WILL OF ANN RICHARDSON.

GEORGE W. RICHARDSON et al., Appellants, v. HATTIE GRAHAM, Appellee.

**WILLS:** Testamentary Capacity—General Rule. A person has testa-
1 mentary capacity if he understands the nature of the will he exe-
cutes, the property to be disposed of, the manner in which he wishes
to dispose of it, and the objects of his bounty, even though his
condition is such that he is unable to transact ordinary business,
and even though his mind is debilitated by age or disease, and
even though his memory is enfeebled and his understanding weak.
Record held insufficient to show testamentary incapacity on the
part of an aged testator who had never been afflicted with a mental
disease or any physical disease affecting her memory, prior to her
last sickness.

**EVIDENCE:** Opinion Evidence—Nonexpert Opinion on Specific Facts.
2 A nonexpert opinion of mental unsoundness based on a specific re-
cital of fact adds nothing to the probative force of such facts.

**WILLS:** Testamentary Capacity—Inconsequential Expert Testimony.
3 Expert testimony on the issue of testamentary capacity is mani-
festly of but little value when based on an erroneous assumption
of a material fact, or when it is simply an asserted opinion that the
testator was not ''in proper mental condition.''

**WILLS:** Undue Influence—Disposition and Opportunity. Undue influ-
4 ence in the execution of a will cannot be established by a showing
that the person accused of exercising such influence (1) was, long
prior to the execution of the will, in a frame of mind to exercise
such influence, and (2) had opportunity to attempt to so exercise it.

**Headnote 1:** 40 Cyc. pp. 1004, 1006, 1007, 1008, 1011, 1165. **Headnote
2:** 22 C. J. p. 732; 40 Cyc. p. 1041. **Headnote 3:** 22 C. J. p. 732; 40
Cyc. p. 1037. **Headnote 4:** 40 Cyc. pp. 1151, 1170 (Anno.)

*Appeal from Harrison District Court.*—EARL PETERS, *Judge.*

FEBRUARY 10, 1925.

REHEARING DENIED MAY 12, 1925.

PROCEEDING for the probate of a will, with objections. The facts are stated in the opinion. From a judgment upon the verdict for the contestant, denying probate, the proponents appeal.—*Reversed.*

*John P. Organ, William P. Welch,* and *R. J. Organ,* for appellants.

*Robertson & Havens* and *Frank Tamisiea,* for appellee.

VERMILION, J.—The testatrix, Ann Richardson, left surviving her nine daughters and four sons, all of whom were adults. Her estate amounted to something over $75,000. The will in question gave to each of three then unmarried daughters, Agnes, Zella, and Nina, $10,000; to three other daughters, $5,000 each; to one, $7,000; and to two others, Mrs. Graham and Mrs. Fitzgibbon, $1,000 each. To one son he devised a farm, for which he already held a contract of purchase. The will recited that, in view of advancements to the other sons by their father, she gave them nothing. It also provided that, should the estate exceed the total amount of the legacies, the excess should be distributed proportionately to the legatees, except Mrs. Graham and Mrs. Fitzgibbon. Mrs. Graham alone filed objections to the probate of the will, based upon the ground that the testatrix lacked the mental capacity to make a will, and that the will was procured by undue influence on the part of the daughters Zella and Nina, and of George W. Richardson, a son, who was named as one of two executors.

Upon a trial to a jury, there was a verdict for the contestant; and the jury, in answer to special interrogatories, found that the testatrix did not possess sufficient mental capacity to make a will, and that the execution of the will was procured by undue influence of Zella, Nina, and George W. Richardson. It is urged that the evidence is insufficient to support the general verdict, and insufficient to support either of the special findings.

The testatrix was a widow, 78 years old at the time of her death. There is no claim by the appellee that the testatrix was ever afflicted with any mental diseases or any physical diseases

1. WILLS: testamentary capacity: general rule.

that affected her mentally until her last sickness. And it is conceded in argument that her mental incapacity to make a will must be shown to have existed at the very time the will was made.

The will in question was executed about 7 o'clock on the evening of Saturday, November 29, 1919, and the testatrix died four days later, of pneumonia. She was, at the time, living in Missouri Valley. She had returned some days before from a visit to one of her sons, living in the country. On Thursday, she complained of a cold, and was lying on a couch part of the time. On Friday afternoon, she went to bed; and on the following morning, Dr. Hoefer was called. He testified that she was suffering a great deal with pain in her chest, labored respiration, and some temperature,—not very marked; and that the symptoms indicated that there might be a possible effusion in the chest. He saw her again in the afternoon. The trouble then seemed to be localized in the right side of the chest, and she was suffering with pneumonia, and effusion had apparently started, and she showed an irregularity of heart action, which he designated as partial heart block. He testified that pneumonia causes poisons in the system until they affect mentality, and that heart block impairs the circulation of the blood, and thereby creates an improper circulation through the brain and the entire system, and could affect the mentality to a certain degree. He advised her son George that, if she had not arranged her affairs, it would be well for him to see to it. It appears from the testimony offered on behalf of proponents that Mr. Dewell, an attorney, was called about 5 o'clock, and prepared the will, remaining at the house about two hours. Within a few minutes after the will was executed, Dr. Hoefer saw her again, in company with Dr. Treynor, who had been called in consultation. Dr. Hoefer testified, in answer to the question whether she was then of sound or unsound mind:

"I don't know whether I could answer that. In a certain sense, she was of sound mind, and in a certain sense, she wasn't of sound mind. My interpretation [of unsoundness of mind] is where your mind is weakened to such an extent you don't know what you are doing. In a certain way, her mind was lacking, to the extent that she would have to be asked a question two

or three times; but whether she was in such a state of losing her reason entirely, I don't know. I would say under those circumstances she was of unsound mind. She was in a certain stupor or mental apathy.''

On cross-examination, he testified:

''I talked to her [on the first visit] about her trouble, when and how it first came on, how long the condition had existed, and asked with reference to its severity. She answered intelligently; and after I had talked with her, and from what she said, from the appearance of her chest and the fact that she had pain there, I supposed it was an attack of pleurisy, or something of that kind, and proceeded to treat her for that. I gave her a cathartic, and returned about 3 o'clock the same day. * * * At that time, I talked with Mrs. Richardson; and in response to my questions, she talked very intelligently, except at times in response to some question, it was a sort of lagging, and I would put the question the second, or perhaps the third, time. This accurately describes her mental condition, as I observed it that afternoon. Sometimes I would have to repeat a question.''

Mrs. Graham, the contestant, and Mrs. Fitzgibbon called later, on the evening of the 29th, but did not then see their mother. They returned the following morning. Concerning this latter visit, Mrs. Fitzgibbon testified:

''Mrs. Graham walked around to mother's bed, bent over and kissed her, and asked her how she was. Mother shook her head,—just closed her eyes. Her eyes were closed when Mrs. Graham walked up to her. Mother's eyes were glassy, and she was weak and pale; her cough was weak, and she breathed hard, fast, and loud. We stayed in the room about ten minutes. Mother did not say anything to Mrs. Graham during that time. During that time, mother opened and closed her eyes, and she would cough. She kept that breathing up all the time that we were in the room that morning. She acted as though she were too sick to really know who it was, or what was being done around the room at all.''

She further testified:

''We went to see mother again that evening. We went twice a day until she died. She was growing weaker all the time. Her eyes were closed most of the time. She was growing thinner,

weaker, and paler each time we visited her.''

The witness testified that, basing her answer solely on the appearance of her mother on the first visit, as she had described it, her mother was of unsound mind. Mrs. Graham testified that, on the first visit:

''Mrs. Fitzgibbon took hold of mother's hand. She was lying on the bed, looked pale and weak, and she would cough, and her breath was very short, and she looked bad. She would open her eyes and close them. Her eyes looked glassy. When we spoke to her, she never answered,—only just shook her head and closed her eyes. We were there about ten minutes. Her eyes were closed when we left. She was breathing hard.''

Basing her answer on her observations on that visit as testified to by her, the witness said her mother was of unsound mind. She further testified that, on subsequent visits, her mother was getting weaker all the time; her cough was weaker, her breathing shorter, and her eyes closed.

Three physicians, in answer to hypothetical questions that described a woman such as the testatrix, suffering from pneumonia and partial heart block for about three days, that resulted in her death in about eight days, and further described her on the fourth day of her illness, and detailed circumstances substantially, in the main, as testified to by the contestant and Mrs. Fitzgibbon, said that, in their opinion, the woman was of unsound mind on the day previous. We have set out substantially all the testimony offered by appellee upon the issue of mental capacity.

We have many times said that mere forgetfulness is not sufficient to establish mental incapacity to make a will. *Gates v. Cole,* 137 Iowa 613; *Perkins v. Perkins,* 116 Iowa 253; *Sevening v. Smith,* 153 Iowa 639. An often quoted statement of the mental capacity required for a testamentary disposition of property is found in the *Perkins* case, supra:

''His mind may have become debilitated by age or disease, the memory enfeebled, the understanding weak, he may even want the capacity to transact many of the ordinary business affairs of life; but if he has mind enough to understand the nature of the instrument he is executing, to recollect the property he means to dispose of, the objects of his bounty, and the man-

ner in which he wishes to distribute it among them, he has testamentary capacity.''

In our opinion, the evidence is insufficient to sustain the finding that the testatrix was of unsound mind at the time the will was executed. She was physically, not mentally, ill. Any mental disturbance or impairment from which she suffered was the result of her physical condition. It is not doubted that, as the result of physical ailments, a person may, in the progress of the disease or by reason of weakness, become mentally incompetent, or that this may occur in the case of one suffering from the ills that afflicted the testatrix; but the evidence wholly fails to show that such a stage had been reached in the course of her illness at the time the will was executed. She was suffering and was weak; but the only indication of mental disturbance noticed by Dr. Hoefer was that it was necessary at times to repeat questions to her. His statement that she was, in a sense, of unsound mind, clearly had reference to that situation as being a departure from the normal.

The opinion of the nonexpert witnesses Mrs. Graham and Mrs. Fitzgibbon, that the testatrix was of unsound mind, is no stronger than the facts testified to by them, on which the opinion was based. *Fothergill v. Fothergill*, 129

2. EVIDENCE: opinion evidence: nonexpert opinion on specific facts.

Iowa 93. As said in the cited case, their opinions were based upon mere physical weakness. They testified to nothing that indicated more than that. When spoken to, the testatrix did not reply, but shook her head and closed her eyes. She was not unconscious, or oblivious of their presence, but recognized it in a way entirely consistent with mere physical weakness. There was testimony that testatrix said that the doctors had advised her to be quiet, and not do much talking. They testified that her eyes were glassy, and that she was weak and coughing; but these things, while they might accompany mental disturbance or decadence, do not necessarily show it, and are not alone sufficient to establish it. The record affords some reasonable explanation of the conduct of the testatrix on this occasion, in the fact that these two daughters were then carrying on a contest of their father's will, as against her, the sole beneficiary, and had not before spoken to her for many months.

The testimony of the expert witnesses who testified in answer to a hypothetical question—a class of testimony generally recognized as weak—is, in this case, of little or no value in determining the mental condition of the testatrix at the time the will was executed. The hypothetical question propounded to one of them contained the assumption that the person inquired about was in a stupor. Stupor is defined as great diminution or suspension of sensibility, and may mean either physical or mental insensibility. The testimony did not show that the testatrix was in a stupor at the time the question so assumed. It is obvious that a person in a state of great mental insensibility would not be in a condition to transact business. Another of these witnesses stated, on cross-examination, that, in answering the hypothetical question, he assumed a condition of stupor,— depressed mentality. The third one answered the hypothetical question by saying:

3. WILLS: testamentary capacity: inconsequential expert testimony.

"I would not consider a person like that mentally—in proper mental condition. I would consider them mentally deficient."

That this falls far short of showing mental incapacity to make a valid will is obvious.

While we are required, for the present purpose, to consider the evidence on behalf of appellee as true, it is conceded, and properly so, that the appellee was required to establish mental incapacity on the part of the testatrix at the very time the will was executed. This is attempted to be done only by the inference to be drawn from proof of her condition at other times, and the opinions of experts based upon a described condition found at another time. The evidence on the part of the proponents shows that, at the time the will was prepared and executed, the testatrix, while physically weak, was mentally alert. Some two hours were taken in the discussion of the terms of the will, between testatrix and the attorney who prepared it, and in its preparation and execution. We shall have occasion to refer in some detail to what then occurred; but for the present it will suffice to say that it was shown that she discussed the various provisions of the will; the amount of her estate; the possible effect of the then pending contest of her husband's will

upon her estate; the situation of her children; her reasons for discriminating between them; and the selection of her executors,—and did this in an intelligent way.

We would not be understood as saying that in no case where only mental incapacity resulting from physical disease is claimed, evidence of a testator's condition before or after the execution of the will may not be such, notwithstanding testimony showing capacity at the time the will was executed, as to make it a jury question. Such was the situation presented in *Womack v. Horsley,* 178 Iowa 1079, and *Dolan v. Henry,* 189 Iowa 104, cited by appellee. But we are clearly of the opinion that, under all the facts shown in this case, the finding of mental incapacity cannot be sustained.

Under our prior holdings, however, this conclusion would not require a reversal, where there was also a finding that the will was procured by undue influence. *In re Will of Van Houten,* 147 Iowa 725; *In re Will of Jahn,* 195 Iowa 74.

Influence, to be undue, within the meaning of the law, must be such as subjects the will of the testator to that of the person exercising the influence, and makes the written will express the

4. WILLS: undue influence: disposition and opportunity.

purpose of such person, rather than that of the testator. It is frequently said that it must be equivalent to moral coercion, and directly connected with the execution of the will, operating at the time it was made. *Perkins v. Perkins,* supra; *Parker v. Lambertz,* 128 Iowa 496; *Henderson v. Jackson,* 138 Iowa 326. The person charged with exercising undue influence need not have been personally present when the will was made, but his influence must have been actively operative. *Brackey v. Brackey,* 151 Iowa 99; *In re Will of Busick,* 191 Iowa 524. Undue influence is not established by proof of opportunity to exercise it and a disposition to do so. *Fothergill v. Fothergill,* supra; *Casad v. Ripley,* 145 Iowa 544; *Zinkula v. Zinkula,* 171 Iowa 287. Importunity, requests, and persuasion that do not go to the point of overthrowing the will of the testator, are not sufficient to constitute undue influence. *Sutherland State Bank v. Furgason,* 192 Iowa 1295; *Perkins v. Perkins,* supra; *Gates v. Cole,* 137 Iowa 613; *In re Estate of Townsend,* 128 Iowa 621.

With these rules in mind, we turn to a consideration of the

evidence which it is claimed sustains the finding of the jury that the will was procured by undue influence of Zella, Nina, and George W. Richardson.

The husband of the testatrix died some sixteen months prior to her death.. By his will, all of his property was left to the testatrix. Shortly after his death, the contestant and Mrs. Fitzgibbon went to the home of testatrix, and had a conversation with Zella and Nina in the presence of the testatrix. Their purpose seems to have been to secure some arrangement for a division of their father's estate at the death of their mother that would be satisfactory to them. They did not want an equal division among all the children, but only among the daughters, claiming that the sons had received their share. Mrs. Fitzgibbon and the contestant testified that on that occasion Zella and Nina said, in substance, that they would see that the mother made her will, and that Mrs. Fitzgibbon and Mrs. Graham would not get a dollar, or only a dollar; that that was the way they were going to fix it, to suit themselves; that Zella said that she and Nina should have more than Mrs. Fitzgibbon and Mrs. Graham, and would see that they did have more; that Nina said they would fix it so that Mrs. Fitzgibbon and Mrs. Graham would probably only get a dollar. They also testified that the testatrix was present, and heard the conversation, but did not take part in it. Mrs. Graham testified that testatrix would stay in the room a while, then walk out into another room and come back, look at the girls, and sit down. No agreement was reached, and Mrs. Fitzgibbon and Mrs. Graham contested the probate of their father's will on the ground of mental incapacity and undue influence. The will was sustained in the lower court. The contestants appealed, and the case was pending in this court at the time the will in question was executed. It was subsequently affirmed. *In re Will of Richardson*, 190 Iowa 586. Although Mrs. Fitzgibbon lived in the same town, and near her mother, and Mrs. Graham lived in the country not far away, and they both saw her frequently, neither of them visited her or spoke to her from the time of this conversation until they visited her bedside, the day after the will in question was made. The daughter Agnes was in poor health, and incapable of taking care of herself. The testatrix and the daughters Agnes, Zella,

and Nina lived together in the home belonging to testatrix until her death. Nina ˙was employed during the day. George Richardson called Mr. Dewell to come to the house ˙to write the will, and was present in the room at the time the terms of the will were discussed between the testatrix and Dewell. The latter testified that George remained in the room at his (Dewell's) request. There is no testimony that George took any part whatever in discussing the terms of the will. He took nothing under the will. Neither Zella nor Nina was present when the terms of the will were being discussed or when it was signed. George called the persons who signed the will as witnesses; but it appears that they were selected by the testatrix, and called at the request of Dewell. There is no other testimony that in the slightest degree tends to establish undue influence on the part of either Zella, Nina, or George Richardson. The testimony of contestant and Mrs. Fitzgibbon as to their conversation with Zella and Nina is contradicted by the latter; but, accepting it as true, as we must in the present situation, it does no more than show a disposition on the part of Zella and Nina to procure a will in their favor, and to the exclusion of contestant and Mrs. Fitzgibbon. In addition to this, nothing is shown, save the opportunity to influence their mother. Under the authorities cited, this is not sufficient to establish that the will was procured by undue influence on their part. There is nothing from which it can be inferred that, at the execution of the will, sixteen months later, their influence was the controlling force inducing the will and. its provisions. George Richardson was examined ˙as a witness by contestant, but was not interrogated as to the making of the will. Mr. Dewell testified for the proponents that the testatrix had previously spoken to him about drawing her will, and that, on the occasion when it was prepared, she said she had sent for him. Concerning the preparation of the will, he testified substantially as follows: That she said she thought she had made up her mind what she wanted; that she thought the girls at home ought to have the most, and some others ought to have more than the rest. When asked if she had any idea what she wanted to give to each one, she replied:

"I don't know that I can tell just how much to give to each one to start on,—I hardly know just how to get at that."

Upon the suggestion of Dewell that the estate (her husband's) was not fully settled, but that they could proceed as if it would come out all right, and if it did not come out as they expected, they could take care of that in some manner, she said: "I thought of that, and did not know just what to do." He further testified that she said, "I think the girls at home ought to have about the same;" that, when asked what next, she said, "Some of them we have helped some, and some a little more than others, and some maybe don't need any help;" that she mentioned Mrs. Becker, Mrs. Farquhar, and Mrs. Sharpnack (her daughters), and said she thought about the same for them; that she said Mrs. Skinner (another daughter) had been helped a little, but not so much, and she ought to have a little more; that she then said:

"Well, there are the other two girls. They have given me a good deal of trouble, and I don't know just what to do about them. I suppose I ought to give them something."

She spoke of Mrs. Fitzgibbon, and said: "I don't think she needs anything; they have plenty." When asked about the other one, she said: "I think that Jack [Graham] has enough." When asked about the boys, she said: "They have all had theirs; guess they can get along for themselves." She said that, if there was enough, she would like to give the girls she gave the most to, $10,000 apiece; and Mrs. Becker, Mrs. Sharpnack, and Mrs. Farquhar,—about $5,000 would be right for them, with the help they had. She discussed what had been given Mrs. Skinner, and said: "I think about $7,000 would be right for her." She asked if she had to give the other two anything, and was told she did not; and replied: "Well, I will give them $1,000,—I guess I can give them that much." She discussed the situation of her son William. On being told that the estate might overrun or run short, depending on how it turned out, and being asked what she wanted to do with the surplus, she replied:

"I think that ought to be divided proportionately,—proportionately in about the same way we have given the different amounts."

She said further:

"The boys don't get anything, and I don't think Mike [Fitzgibbon] and Jack [Graham] ought to have anything more."

When asked what should be done in case the land did not sell for enough, and there would not be enough to go around, she said: "Well, I think each one ought to stand the proportion too." The possibility that her husband's will might be set aside, and she would not have enough to give all the girls the amounts she had specified, was spoken of, and she said, "No, I suppose I only get a third then. I wouldn't have so much to give away;" and said she wanted them to share proportionately, in that case. After the will was prepared, it was read over to her, and she said it was just as she wanted it, and signed it in the presence of the subscribing witnesses.

This testimony is uncontradicted. We find nothing whatever in the evidence that would warrant a finding that the will was procured by undue influence on the part of the parties charged with so doing.

Upon the whole record, we are convinced that neither the general verdict for the contestant nor the special findings that the testatrix was of unsound mind and that the will was the result of undue influence are supported by the evidence. There should have been a directed verdict for the proponents, and the verdict and special findings should have been set aside.

The judgment is—*Reversed.*

FAVILLE, C. J., and STEVENS and DE GRAFF, JJ., concur.