ELIZA J. WOMACK, Appellee, v. PAULINE HORSLEY et al., Appellants.

**WILLS:** Testamentary Capacity—Inferences of Incompetency Overcoming Direct Evidence of Competency. The fact that all the witnesses (concededly credible) present with testator when the alleged will was executed, unite in direct and positive testimony that the testator was then, of sound mind, does not necessarily prevail over permissible inferences to be drawn from prior and subsequent conditions of the testator. Such conditions and such positive evidence may be so at war that a fair jury question results.

PRINCIPLE APPLIED: Three subscribing witnesses and a nurse all united in positive evidence that testator was of sound

mind when the alleged will was executed. On the other hand, the testator, 85 years of age, was concededly suffering from enlargement of the prostate gland, the closing of the urethra and the consequent retention of the urine. Concededly, absorption into the body of the virulent poison resulting from this condition was in time inevitable, with resulting wasting away of the body and derangement of the mind and coma, and, lastly, death. Whether the absorption of this poison had commenced at the time the alleged will was executed, with consequent incapacity to execute a will, was in dispute. Held to present a fair question for jury, and directed verdict properly refused.

**WILLS:** Testamentary Capacity—Instructions—Sufficiency. Incapacity at the very time of the execution of the alleged will is the all-important test. Instructions reviewed, and held to sufficiently present the rule.

**APPEAL AND ERROR:** Harmless Error—Improper Question with Harmless Answer. Harmless error follows the asking of an improper question responded to by a harmless answer. So held where the question called for a conversation with a deceased person, but the witness answered that she had had no conversation with deceased.

**WITNESSES:** Competency—Transaction with Deceased—What Is Not. Testimony of a witness that she did not, during a certain period of the sickness of the deceased, hear anyone talking to him, is not testifying to a personal transaction or conversation with deceased. (Sec. 4604, Code, 1897.)

**TRIAL:** Instructions—Form, Requisites and Sufficiency—Common Usage of Speech. A jury is presumed to have knowledge of the common usage of speech and understanding. So held where the jury was told that, under the record, a deceased died ''on the night of Oct. 6th.'' In fact, he died sometime after midnight.

**WILLS:** Testamentary Capacity—Definition. The following instruction on testamentary capacity has stood the test of judicial criticism for half a century, to wit:

''If the testator, at the time of the execution of the instrument in question, has sufficient mental capacity to understand the nature of the act in which he is engaged, and to recollect and know the extent of his property and the natural objects of his bounty, and to know and comprehend the manner in which he wished to distribute his property among them, he has sufficient mental capacity to make a valid will—he has testamentary capacity.''

*Appeal from Fremont District Court.—O. D. WHEELER,*
                    Judge.

FRIDAY, APRIL 9, 1915.

REHEARING DENIED MONDAY, DECEMBER 18, 1916.

ORIGINAL action to set aside the probate of the will of
John Horsley, deceased. The only ground of attack sub-
mitted to the jury was mental incapacity. There was a ver-
dict for the contestants. The proponent appeals.—*Affirmed.*

*Tinley, Mitchell & Thornell,* for appellants.

*T. S. Stevens* and *John M. Stewart,* for appellee.

EVANS, C. J.—I. John Horsley died October 7, 1912, in
Fremont County. He had been a long-time resident there.
He left a considerable estate, consisting mainly of 1,100 acres
of land. At the time of his death, he was 85

1. WILLS: testa-
mentary capac-
ity: inferences
of incompetency
overcoming
direct evidence
of competency.

years of age. He had been twice married,
and left surviving him his widow, the pro-
ponent of the will. He had never had chil-
dren. He was survived by a number of
nephews and nieces as the only heirs at law, and these are
the only contestants. Until the time of his last illness, he
was a man who attended to his own business affairs success-
fully. He was perhaps a man of rather exceptional vigor
for his years, both bodily and mentally, though he was an
unlearned man, in the sense that he could neither read nor
write. His final illness began on September 16, 1912, and
ran its course in three weeks. The principal question pre-
sented for our consideration is whether there was sufficient
evidence before the trial court to justify the submission of
the case to the jury. The proponent duly moved for a
directed verdict, on the ground of the insufficiency of the
evidence on behalf of the contestants.

There were three subscribing witnesses to the will, includ-

ing the attending physician. A fourth witness, the attending nurse, also testified. These witnesses all testified to the sound mental condition of the testator. No other persons· except the proponent were present at the time of such execution. The direct evidence, therefore, as to what transpired at the very time of the execution of the will, is all in support of the will. The evidence on behalf of the contestants is directed to the condition of the testator as it was observed by witnesses immediately before and immediately after the execution of the will.

The general contention of the appellants is that such testimony was not sufficient to overcome the direct evidence of the subscribing witnesses, and especially so because the mental condition of the testator, as observed prior to the execution of the will, was not shown to be of such a permanent and progressive nature as to raise a legal presumption of its continuance; that, therefore, testimony of such prior condition was not available to the contestants to impeach the mental condition of the testator at the moment of the execution of the instrument; and that the testimony as to the mental condition of the testator subsequent to the execution of the will was not available to that end, because it was not inconsistent with a. previous sound mental condition.

We have gone through the record with much care, under a sense of the solemn duty which rests upon all courts not to permit testamentary instruments to be torn by mere whim. The final illness of the testator resulted from a kidney and bladder trouble. Two years prior, he had had a considerable illness, in the form of inflammation of the kidneys and prostatic trouble. His final illness resulted from prostatic enlargement. The first physician called was Doctor Wiese. He was a witness for the contestants. The following was his description of the general nature of the illness of the testator:

"He was troubled with senile hypertrophy of the prostate gland, a fatal condition which takes place in old age, and especially at his age, in about 32 per cent of old men.

I mean by that the enlargement of the prostate gland. The prostate gland is shaped similar to a horse-chestnut, and is at the neck of the bladder, half on one side and half on the other side; the urethra goes through it. The urethra is the channel the urine passes through. In certain conditions of old age after a person is sixty, the prostate gland expands, it gets three or four times larger than it ought to be, and presses on the neck of the bladder and the urethra, and in this condition the bladder is never capable of being entirely empty; it closes up the passage, and the urine just drops a little by little. I told Mrs. Horsley to keep on with the decoction of that diuretic, which is a medicine for the kidneys; and that I would use a catheter to draw the urine off when needed. . . . I treated him after he was taken sick, a little over two weeks, I think. He didn't get any better because it was impossible. . . . I could see that he was gradually getting worse. There was more and more inflammation of the neck of the bladder, as well as paralysis of the body of the bladder, and more and more urine would be accumulated all the time, and there was not muscular action enough to expel it. There was a uremic condition. There is a certain principle in health, in urine, called urea, that is always present. If there is stagnation of the urine that cannot be expelled from the bladder as it should be, the urea multiplies and ferments and makes a very serious poison. It affects the system by absorption. I observed that in this case. It takes place very slowly. There is always more or less pain with that disease. The pain was from the enlargement of the prostate gland; it presses on those nerves, or on the nerve centers, and they reflect to the spinal cord, and from the spinal cord to the brain, and causes pain. Q. Would that pain be continuous, or come in paroxysms? A. It came periodically. Well, you can't see it coming on; it is impossible; it comes in old age; all men do not have it. I observed a retention of urine; that is the first symptom, they cannot urinate. The next effect will be the continual dilation of the

bladder; the bladder expands more and more; and the muscular fibre,—the net work of muscular fibre which contract and make the bladder,—they lose their action, and the urine lays there and cannot run out at all. . . . A. I just said awhile ago I treated him, during the time, and all the time, the uremic poisoning hadn't taken place yet. Q. Then, you say, during the time you treated him that you hadn't observed symptoms of uremic poisoning? A. No, sir; but it is bound to take place sooner or later. Q. What are the symptoms of uremic poisoning? A. That uremic poisoning comes and the system naturally wastes away; the patient becomes emaciated and exhausted. They cannot retain a thing in their stomachs; they cannot eat a thing, no matter what it is; then comes derangement of the mind, and finally coma. Coma is stupor. Stupor comes before death, and only in the last stages, of course, the last few days. They all die of that trouble. They all die in a comatose condition, in a stupor.''

On the 23d of September, Dr. Ginn became the attending physician. He was a witness for the proponent. He testified for the proponent as follows:

''The effect of the retention of urine would be to inflict intense pain in the bladder. I was not able to keep the bladder drained. I would draw the urine with a catheter, and then remove the catheter; wait several hours and then do it over again. To leave the catheter in would be to irritate it. When I would introduce the catheter, he would struggle, throw himself around with pain. There was no pus; there was no pus that came from the bladder. If there had been any pus, it would come through the catheter. The slime would close up the catheter,—I mean the secretion from the inside of the bladder, from the walls of the bladder; that is not pus, it is a gelatinous fluid. There might have been pus there; I do not know; I cannot say there was pus in the bladder. It would not be there naturally, nor ordinarily. It would not have affected him any more than ordinary in-

flammation. It would not be absorbed, because it could pass out or drain out. I didn't test to find out whether there was any pus, or not. There was mucus, possibly pus. Whatever there was, drained through the catheter. There is very little absorption from the bladder.''

There was no dispute between the physicians as to the character of the disease which afflicted the testator. There was dispute as to the effect of such disease upon the mental condition. According to the medical testimony offered by the contestants, the affliction of the testator was bound to develop into stupor and coma, which would last a ''few days'' before death. The evidence is abundant that the testator did pass into a state of coma before his death. How long before his death such a state was reached is a question of sharp dispute. The will was made under apparently pressing circumstances. At about 2 o'clock on Friday morning, October 4th, the condition of the patient became sufficiently alarming that the nurse called for the doctor, who lived in another town, several miles away. He arrived there at about 3 o'clock. The condition of the patient was such that he had no further hopes for his recovery, and so advised him. Morrow, a banker, was called to the house for the purpose of drawing a will. Morrow called Smith to aid him. We need not dwell upon or detail the evidence in behalf of the proponent. It was abundant to have sustained a favorable verdict. The question that concerns us is the testimony on behalf of the contestants. For the purpose of such consideration, we must deem it as true. Starting with the proposition that the testator was afflicted with a disease which, if finally fatal, must end in permanent stupor and coma of a few days' duration before death, the evidence of the contestants was directed to the proof that such stage had been reached in the progress of the disease before the will was executed. Their witnesses testified to their observations of the comatose condition of the testator on days previous to Friday, and especially on Thurs-

day; and again to a like condition after the will was made, and up to the time of his death. Assuming the medical hypothesis to be correct, we ought to assume also, perhaps, that the first stages of the stupor would be less marked and less persistent than its later stages. Granting that, in its earlier stages, the patient would be able to shake it off and to maintain intermittently a sane mental condition, it was permissible to the contestants to contend that a stage of progress would necessarily be reached at some point where the stupor of the disease would overcome the power of the patient to shake it off. For such purpose, it was competent to prove the apparent stupor and comatose condition of the testator on the day or days before the instrument was executed, as well as on the succeeding days. There was evidence for the contestants that, as early as Sunday, September 29th, the testator was in such a stupefied condition that he could not recognize his pastor, who had called upon him. No narcotics of any kind had been administered at any time during his sickness. If he was in a stupor, it was as a result of his disease, and not the temporary result of any morphine preparation. The disease had its progressive stages, and it passed through them to the fatal end. Though it be true that his sickness was physical, and not mental, it was equally true that the regular course of the disease would affect the mental condition, by first beclouding it and finally darkening it, and this would occur an appreciable time before final dissolution. In that sense, the impairment of the mental condition of the decedent, as observed on a particular day, might at least be permanent and progressive. The evidence of the contestants is directed to occasions when the condition of the patient was open to the observation also of the witnesses for the proponent. This testimony on behalf of the contestants is met by sharp contradiction on behalf of the proponent, to the effect that the testator was not in such a condition of stupor at the time testified to. The question here is not one

of alternating periods of darkness and light. The conflict of evidence is such at this point as to put the witnesses to the test of credibility. This test was necessarily a test before the jury.

It is true, as argued by appellant, that the only evidence of mental unsoundness at the moment of the execution of the instrument, was a matter of mere inference. This of itself is not an objection to the proof. Inferences are inevitable in all trials of disputed fact, and are usually important links in the chain of proof. It is earnestly argued that inference should never be permitted to overcome positive and direct testimony. No authority is cited for such rule. It is safe to say that there is no authority for it. Appropriate inferences from proved facts are not a low order of evidence. Whether they should be permitted to overcome positive and direct testimony or not, depends in every case upon the relative strength of the one or the other. The very credibility of direct evidence may be destroyed by the force of irresistible inferences.

We reach the conclusion upon the whole record that the testimony for the contestants, though not strong, was sufficient to carry the case to the jury. We think it must be said also that the direct testimony in support of the will as it appears in this record is, in some respects, unsatisfactory, and open to unfavorable inferences.

' In view of our conclusion at this point, we need not dwell upon a consideration of previous cases. Very able briefs are presented by counsel covering our previous cases. Special reliance is placed by appellant upon *Convey v. Murphy,* 146 Iowa 154; *Speer v. Speer,* 146 Iowa 6, 16; and *Hingst v. Jones,* 166 Iowa 329. In our judgment, the cases are not at all controlling of the present case. What we have already said will sufficiently indicate the distinction between those cases and the case at bar.

II.   Objections are urged to the instructions. Their ab-

stract correctness is conceded. It is urged, however, that they are not sufficiently explicit, and especially so in that they did not direct the attention of the jury with sufficient emphasis to the fact that the burden was upon the contestants to show the mental incompetency of the testator at the very moment of the execution of the instrument. In the eighth instruction, the court did instruct the jury that the testator was presumed to have been of sound mind at the time the will was executed, and that the burden was upon the contestants to prove that he was incapable to do so "at said time," and that they "must establish the incompetency of the said John Horsley at the said time." This covered the point with some degree of emphasis at least. It is true that the point might have been overlooked by the jury, but counsel had the right of argument. Emphasis is one of the privileges of argument, and it is not often neglected by the respective attorneys. Undue emphasis of a particular point in the instructions has its own perils of unfairness, and we think that the exercise of that function may to some extent be intrusted to respective counsel.

2. WILLS: testamentary capacity: instructions: sufficiency.

III. Eliza J. Womack, one of the contestants, was a witness in her own behalf. Objection was urged to a considerable part of her testimony, on the ground of her incompetency under Section 4604, Code, 1897. These objections were overruled, and error is now assigned thereon. It is not claimed but that the witness might properly testify to mere matters of observation on her own part, even though they concerned the conduct of the testator. Only one question and answer are presented in argument, as follows:

3. APPEAL AND ERROR: harmless error: improper question with harmless answer.

"Q. Did you talk to him any? (Objected to by defendants as immaterial, irrelevant, incompetent, witness incompetent under Section 4104 of the Code. Overruled; defendants except.)  A. Not the last week. Never heard anyone else talk with him."

The argument is that, if the answer of the witness had been affirmative instead of negative, it would have disclosed a personal transaction, and that the objection to the question,

**4. WITNESSES: competency: transaction with deceased: what is not.**

therefore, ought to have been sustained. The answer, however, being negative, rendered the error nonprejudicial, if error there was. In so far as the answer disclosed the observations of the witness of an absence of conversation on the part of the deceased, it was a matter of observation, and nothing more.

**5. TRIAL: instructions: form, requisites and sufficiency: common usage of speech.**

IV. The following appears in the instructions of the court:

"It appears to be conceded that, on the night of October 6, 1912, John Horsley died in this county."

It is urged that the testimony shows the testator to have died on October 7th, and that the statement of the court was, therefore, prejudicial. It does appear from the testimony that decedent died some time after midnight, Sunday night, October 6th. The record before us does not disclose at what hour. It does appear that he did not speak or move after 8 o'clock Sunday evening. The petition stated the date of his death as October 6th. No issue was made upon that allegation, nor any attention directed to it in the course of the trial. The statement of the instructions as above quoted was true, according to a common usage of speech and understanding. There was nothing misleading about it. It was not calculated to convey any other impression to the minds of the jury than that the decedent died sometime between sunset Sunday and sunrise Monday.

**6. WILLS: testamentary capacity: definition.**

V. In Instruction 9, the trial court defined testamentary incapacity. Such instruction included the following:

"If the testator, at the time of the execution of the instrument in question, has sufficient mental capacity to understand the nature of the act in which he is engaged, and to recollect

and know the extent of his property and the natural objects of his bounty, and to know and comprehend the manner in which he wished to distribute his property among them, he has sufficient mental capacity to make a valid will—he has testamentary capacity.''

It is urged that the instruction was erroneous, especially as applied to the case at bar. It is urged first that many testators do not know the full extent of their property, especially where large properties are involved, and that the instruction would render such persons incapable of making a will. It is also argued that, in the case at bar, the testator had no natural objects of his bounty except the proponent, his wife; or that, if the collateral heirs be deemed such objects, then confessedly there were some which he did not know; that, therefore, by this part of the instruction he would be deemed to lack testamentary capacity, because he did not know all his nephews and nieces. The argument has its ingenuity, but it does not strike squarely at the instruction as given. The standard laid down in the instruction did not purport to measure the extent of the actual knowledge which the testator should have. ''Sufficient mental capacity'' to know was the standard laid down. It would doubtless be conceded that a testator might safely make provision in his will for nephews and nieces or other classes of relatives or persons without actually knowing personally the individuals thus provided for, or the number of individuals thus provided for, and yet not be deemed lacking in ''sufficient mental capacity'' to know them. The instruction complained of at this point is quite formal and stereotyped, and has been given by the trial courts of this state for 40 or 50 years, and we are not disposed to pluck its gray hairs now. Indeed, we deem it quite unobjectionable.

Finally, complaint is made of misconduct of counsel for the contestants in his closing argument to the jury. The general nature of this complaint is that counsel argued matters to the jury which had been withdrawn by the trial court.

Certain issues were withdrawn at the close of the testimony. The jury was later informed by the instructions that they were withdrawn. The control of the range of argument to the jury is a matter peculiarly within the discretion of the trial court. Manifestly, only an abuse of such discretion would justify our interference. The argument here complained of was not above criticism but we find nothing that would justify our interference with the discretion exercised by the trial court. Perfect arguments to the jury are somewhat rare; and if such standard were enforced too strenuously, it might postpone the day of judgment in too many cases.

We reach the conclusion that the verdict of the jury must stand in this case, and the order of the trial court is therefore—*Affirmed.*

DEEMER, LADD and PRESTON, JJ., concur.