KATHERINE DOLAN et al., Appellants, v. JOHN HENRY et al., Appellees.

**WILLS:** Jury question as to Mental Incompetency. Evidence reviewed in detail, and held to present a jury question on the issue of testamentary capacity.

**WILLS:** Unnatural Distribution as Bearing on Mental Competency. An unequal and unnatural distribution of property by testator, no explanation appearing, presents a circumstance for consideration on the issue of testamentary capacity.

**WITNESSES:** Transactions With Deceased. A witness who is incompetent to testify to personal transactions or communications with a person since deceased, is not incompetent to testify to matters of observation, bearing on the physical condition of such person; i. e., (1) "that he was delirious;" (2) "that

he was kind of murmuring and talking to himself about things that happened years ago;" (3) "that he talked incoherently."

**EVIDENCE:** Duration of Condition of Mind. An expert who has personal knowledge of the condition of a testator at a certain time may testify, not only (1) as to testator's mental incompetency at said time, but (2) as to the probable duration thereof.

*Appeal from Linn District Court.*—JOHN T. MOFFIT, Judge.

### MAY 22, 1920.

AFTER the will of James Henry had been-admitted to probate, four of his five children sought to have the purported will set aside as the product of undue influence, and for that decedent was of unsound mind when it was executed. At the close of all the evidence, the jury was directed by the court to return a verdict for the proponents, which was done, and judgment entered thereon. The contestants appeal.—*Reversed.*

*Deacon, Good, Sargent & Spangler,* for appellants.

*Johnson, Donnelly & Swab* and *B. L. Wick,* for appellees.

LADD, J.—James Henry died February 21, 1916, at the age of about 82 years, survived by five children, the contestants and John Henry, one of the proponents. The other proponents are the sons of John, the grandsons of decedent. The latter's wife departed this life intestate, about 40 years previous to the death of her husband, seized of 160 acres of land, and he had never remarried. At that time, their youngest child, Katherine, who was subsequently married to one Dolan, was 2½ years old, and the eldest child, William, was about 11 years of age. Decedent then owned 80 acres of land, which subsequently was sold by him to his daughter, Maggie Harrington, in payment for which he received

*1. WILLS: jury question as to mental incompetency.*

money and the conveyance of her interest in the realty left by her mother. This, with the one-third interest he had inherited from his deceased wife, left him owner, at the time of his death, of 7/15 of the 160 acres, and of 100 acres north of Fairfax, which he had since purchased; and he had personal property, consisting of a horse and deposits in several banks, amounting to about $6,000. The paper purporting to be his last will and testament, made December 22, 1915, after directing the payment of funeral expenses and the erection of a monument, provided that his property should pass "to my five children, subject to the following items and conditions, to wit: First: I bequeath all of my real estate, including my seventy acres in Section nineteen (19), Fairfax Township, and also including my farm of a fractional one hundred acres lying north of Fairfax to my son John and his sons as follows: my son John is to have the use and crops, rents, etc. from the land during his lifetime. At his, John's death, his sons shall have the use, crops, etc. during their lifetime. However, the land is not to be sold or incumbered during the lifetime of my son John or his sons. Second: To my son William, I bequeath the sum of five hundred dollars ($500.00), said sum to be held in trust for him and he to have the income derived therefrom. At his death, the principal to revert to my estate to be diverted as the personalty among my daughters, and also subject to the conditions under which my daughters receive their respective portions of my estate. Third: All the balance of my personal property, including my cash, notes, money in bank, stocks, rents, amounts due me, etc. are to be divided among my daughters as follows and subject to the following terms: (a) To my daughter Maggie Harrington I give one third of the personalties and money mentioned and set out in Clause three preceding. (b) To my daughter Katherine Dolan I give one third of my personalty mentioned and set out in Clause three preceding. (c) To my daughter Nellie Horrigan, I bequeath one third of my personalties mentioned and set out in Clause three preceding, said one third to be held in trust for her and she to have the interest

and income derived therefrom during her lifetime and at her death her one third shall revert and be divided equally among the three children, John, Maggie and Katherine."

His son John was designated to act as executor. There is no controversy but that the evidence was insufficient to sustain a finding, were it made, that the will was the product of undue influence. Contestants contend, however, that the court erred in ruling that the evidence was insufficient to raise an issue as to whether the deceased was of unsound mind when he signed the paper purporting to be a last will and testament.

I. Some details are essential to a correct understanding of the relations between deceased and his children, as bearing on the fairness of the will. William was past 53 years of age, at the time of the trial, had never been married, had left home when 15 or 16 years of age, had lost one arm, when about 22 years of age, and, 9 or 10 years previous to decedent's death, was in some way dragged, so as to dislocate his hip joint, after which he was a helpless cripple, and, at the time of the trial, was without means, and was making his home with his youngest sister, Katherine. He had never received any rent or income from his undivided 2/15 of the 160 acres which he had inherited from his mother, and conveyed such interest to John in 1910 for a consideration of $3,000, which must have been expended thereafter in caring for himself. Katherine, the youngest child, married, when about 32 years of age, and had five children. Her husband, Dolan, was a fireman in Cedar Rapids, and their only property, at the time the alleged will was made, was a home, valued at $3,500, with an incumbrance of $1,000. She had participated in keeping house, worked in the field, husked and plowed corn, pitched hay, harrowed, cultivated, put in oats, shocked grain, milked cows, done chores, and helped in farm work generally which ordinarily is done by men, besides housework, save when attending school in Cedar Rapids during three terms, and teaching one year. When her father purchased the 100 acres north of Fairfax, in about 1900, she accompanied him

to that farm as housekeeper, and did outdoor work, as described, during four or five years, until her marriage. His daughter Nellie had assisted her father in all matters about the farm, as did Katherine, until her marriage, at 29 years of age; and, after her husband's death, she returned to his home on the 100 acres, where she remained about 3½ years, until after Katherine had left, when she married her present husband, Horrigan, and is now living on 80 acres of land which she owns, subject to a mortgage of $1,400, which is fairly well stocked. Margaret lived at home, save when attending school and teaching about six years, until about 28 years of age, when she married one Harrington. About 1905, she purchased the 80 acres of decedent, as heretofore stated, and it appears that she has four children and an intemperate husband. John Henry has lived, with the exception of a few months, on the 160 acres all his life. From the time decedent moved to the 100-acre farm, he had enjoyed the use of the premises, without accounting therefor to his brother and sisters or father, except, possibly, the rent for one year, until the settlement in 1910, when he acquired the interest of all except that of decedent, which included the share of Mrs. Harrington, paying each of his two sisters and William $3,000 therefor. His realty is incumbered for something over $5,000, and he is indebted about $1,000 besides. His personal property is quite sufficient to offset the indebtedness. He was married in 1903, and has six children. Decedent made his home with John during the last 6 or 7 years of his life.

From this recital it is manifest that John had no claim on the decedent's bounty superior to that of any other of his children, and a much smaller claim than had William. True, the latter had left home at 15 or 16 years of age, and John swore that:

2. WILLS: unnatural distribution as bearing on mental competency.

"He returned one time, when he got hurt, 9 or 10 years ago, I think; and, up until that time, he hadn't been home for over 30 years. If he was at home, I never saw him. He used to go to the neighbors' and to Bolands' and stay there, but he never

came to our house   The time he got hurt was the only time he came to our house before my father died. The last time he came back, he didn't come to our house; he was around there, and to Mrs. Harrington's and to Mrs. Horrigan's, I guess, and to Cedar Rapids, but didn't come home. I never saw any letters addressed by him to my father, and I never saw any letters written by my father to him."

On the other hand, Mrs. Dolan testified that:

"He came back and forth, when he first left, and he came back again and stayed probably a year, and worked, and then went away again. He came back and stayed at intervals. When he went to railroading, he left the community, and there was quite a lapse of time before he came back. After he went to Superior, we heard from him occasionally. There might have been a period of a few years that we were doubtful where he was, and his letters might not have come frequently. Before his arm was taken off, there was quite a few years, I think, that we did not hear from him. There were many years that he didn't show up on the home farm at all. He came back, two or three years previous to when he made a division of my mother's estate, and was still there when we made the division. He had been disabled in Superior, and came back to Cedar Rapids and stayed with me about two years.  *  *  *  After he got the $3,000, he went back to Superior and stayed about three months, and then came back and spent the winter with me."

From this and other evidence, which need not be set out, the jury might have found that, though William had been absent many years, his relations with his father had been friendly, for several years at least, and, in view of his help-less condition, it is scarcely conceivable that a father with sound mind should have limited his bounty to his helpless first-born son to the mere pittance of $25 or $30 per annum, interest on $500, and have, at the same time, bestowed on his other son, in the vigor of health, and well-to-do, compe-tent to care for himself, the use of all his land for life, and thereafter a life estate on John's sons, and on the three

daughters, all his personal property. What became of the remainder? Why should he have thus discriminated against this helpless son, and, further, why should he have discriminated between John and his daughters? That he had made his home with John, after Mrs. Horrigan had ceased keeping house for him, surely does not account for this; for, during this time, John was enjoying the use of 74⅔ acres of land belonging to his father, and no claim is made but that the father met all his expenses, out of the income which he must have derived from the 100-acre farm and moneys on deposit with the bank. No charity, then, was involved in providing a home for decedent. We have discovered in this record no tenable ground for discriminating between his children, as manifested in this will, and the jury might have found that the disposition of his property, as therein directed, was unequal and unnatural, as between the children. If so, this was a circumstance to be considered in determining whether the decedent was of sound mind. *Manatt v. Scott,* 106 Iowa 203; *Mileham v. Montagne,* 148 Iowa 476, 485; *Stutsman v. Sharpless,* 125 Iowa 335; *Cash v. Dennis,* 159 Iowa 28. Nothing to the contrary appears in *Zinkula v. Zinkula,* 171 Iowa 287, where the right of the testator to dispose of his property as he wishes is recognized, as was done in the decisions cited.

II. The evidence disclosed that the deceased was a large man, of positive character and of unusual strength; that, during the latter part of his life, he had done the chores about the premises, and especially when John was away from home; and that, if anyone was there, he would merely attend to his horse. John testified that he continued in usual health until taken sick, on December 19, 1915; and John's wife, that he seemed to be pretty nearly as usual for several weeks before that time. She related that she had seen him start for town, early in the month, when she went to the barn and informed her husband, and then watched him from the window, and saw him fall, after he went over a fence at the railroad track; that he lay a few min-

utes, then got up and went on. Mrs. Dolan related that, two or three years previous, decedent had been very sick at her home, for a few days, and from that time to his last sickness she had "noticed he was larger over the abdomen region. He wasn't so lively; he couldn't get around so well; he wasn't so much of a talker; he would sit around and not have much to say, and very often he would fall asleep in his chair; he would fall asleep, and not rouse easily. I noticed drowsy spells."

Mrs. Harrington swore that her father's abdomen had been enlarging for a couple of years, and that she had observed that "father, for several weeks and months prior to his last sickness, was drowsy." John's wife said that he would get gas on the stomach, and would belch it up. There was room, then, for the jury to find that decedent was in failing health for two years at least, prior to his last sickness.

III.  Mrs. Harrington was at the home of John for about three hours on December 19th, and testified that her father "had a cold chill, and was trying to raise gas from his stomach; his abdomen was bloated." Dr. Dvorak was called, and reached the decedent at about 2 o'clock A. M. of the next day, and, shortly thereafter, John telephoned Mrs. Harrington that her father was very sick; and she came in the morning, at 5 or 6 o'clock. She testified that he was then suffering pain; that his skin was of a yellowish color; his abdomen swollen; and that he was feverish. The priest was called, shortly after daylight, and administered the last sacrament of the church and extreme unction. Later, she notified Mrs. Dolan, who arrived about 9 o'clock in the evening, and remained until the 23d. She testified to having found her father in bed; and that he was bloated, was in great pain, and tried to vomit repeatedly until midnight, without raising anything; and that, in the morning, his skin appeared to be yellow; that, when she stepped into an adjoining room, to attend to her child, she heard her father moaning and talking about his troubles; that, after the scrivener had drawn the will and left, she heard her

father say to Mrs. Harrington, "Maggie, I gave you the money." Mrs. Harrington returned again at about 5:30 o'clock in the morning of the 22d, and she swore that, as she entered the house, she could plainly hear exclamations of pain and suffering by her father, and that he was "talking to himself in a kind of rambling way." Dr. Murphy, of Cedar Rapids, had been called by Mrs. Dolan, and he came out by way of Fairfax, bringing Dr. Dvorak with him, and arrived shortly after 8 o'clock in the morning, and immediately proceeded to examine decedent. Shortly after the physician's departure, John called a scrivener to draw the will, and the latter reached decedent in about a half hour, as estimated by one witness, or in an hour or an hour and a half, as estimated by another. Mrs. Harrington swore that she heard the scrivener say to her father, "You want John for your executor, don't you?" but did not hear the answer; that she heard him ask if he knew how much personal property he had, and her father responded that he did not know; that, at times she was in the room, hot applications were applied to decedent; and that, when she was there, her father's eyes were closed. Mrs. Dolan thought Dr. Dvorak left the sick room before Dr. Murphy. She testified, also, that she noticed, during the night before, decedent's urine in receptacle; that it was thick and the color of coffee, or of copper when thrown on the snow; that she was in the room all the time Dr. Murphy was there; that decedent winced, when the doctor tapped him on the shoulder; that, as soon as Little could obtain turpentine from town, after the doctor left, applications of hot water and turpentine were kept on the right side of decedent's abdomen and right shoulder, until 3 o'clock in the afternoon; that her father's abdomen was relieved, by 1 or 2 o'clock in the afternoon; that, previous to that time, he was badly bloated and full of gas, and had great difficulty in breathing; that, after the application of these hot cloths for some time, the gas began to escape from his bowels and through his mouth, and the perspiration started, and he became more restful; that a very large amount of gas es-

caped.; that, after this, he became restful and quiet. Mrs.
Horrigan did not reach her father's bedside until after the
will was signed, and testified that, when she entered the
room, she didn't think her father recognized her; that "he
was kind of murmuring and talking to himself about things
that happened many years ago."

The portion of the answer quoted was stricken, on mo-
tion, for that, as was said, the witness was incompetent,
because of the bar of Section 4604 of the Code. The ruling
was erroneous, for that she had not testified
to any transaction or communication be-
tween her father and herself. There was no
room to. infer that the murmuring or talk-
ing was directed at the witness. The evidence, then, should
be regarded as a part of the record, in passing on its suffi-
ciency to carry the issues to the jury. The witness testified,
further, that her father "appeared to be kind of stupid and
drowsy," but became better, at about 1 o'clock, after being
relieved of the pain and gas.

3. WITNESSES:
transactions
with de-
ceased.

IV.  Dr. Murphy, after qualifying, related that he had
known decedent about 15 years, having last seen him about
5 years previous to the examination; that he found him
sick in bed; that decedent apparently did not recognize his
coming into the room; that he learned the history of the
case from his daughters; that he remarked to decedent that
he was sorry that he wasn't feeling well, to which no re-
sponse was made; that he then proceeded to make an exam-
ination; that the heart action "was rapid, with impaired
compensation, impaired action, common to elderly people;"
that his pulse indicated a hardened condition of the art-
eries; that "he was suffering from arterial sclerosis." He
explained that "the blood vessels get hard and tense, and, in
the small organs, well defined; the small arteries shut off
the normal supply of blood, and the parts of the body are
impaired;" that the disease is recognized by shortness of
breath, rapid pulse, rapid heart action, and is associated
with Bright's disease, particularly in advanced life; that he
noticed a slight swelling in the lower extremities, and some

in the abdomen; that his skin was slightly discolored; that small blood vessels were prominent, particularly in the region of the temporal bone, and the lips were dry; that his eyes were slightly watery and considerably discolored; that diminishing the blood supply to the organs of the body, and particularly the brain, impairs them; that the mind or brain of a man suffering from arterial sclerosis is not normal; that the disease had gone on to an advanced degree; that the vessels of the wrist were prominent and hard, rolled under pressure, and were much like pipe stems; that decedent was suffering from the progressive condition that follows arterial sclerosis; that, in his opinion, he was suffering from Bright's disease, which was an aggravation of a chronic condition; it was the flaring up of an old trouble; that a man who was suffering from arterial sclerosis and Bright's disease would very likely be fired up and aggravated; that the diseases he found "would produce intoxication of the system, a failure to throw off the normal secretions," and the poisons would be reabsorbed in the body, and carried in the blood as long as it continued to circulate; that the intestines were stretched with gases; that the liver was in a stage of contraction, called cirrhosis of the liver, which would impair decedent physically and mentally; that the normal amount of bile would not be secreted, and the blood would not be renovated; that his body would become toxic, and his skin become yellow. It was the opinion of the doctor that the failure to eliminate these poisons of the body reduced decedent's vitality, and tended to produce coma; that the failure of the liver and kidneys to eliminate the poisons from the body would impair the brain; that Bright's disease had existed for several years, and was in the acutely aggravated condition; that the elimination process of his kidneys, assisted by his liver, was impaired at that time, about ⅔ to ¾ of normal; that a toxic condition precedes the state of coma; that decedent was "breathing faster than he should; he was toxic; his skin was dry, harsh, and tense:" and the doctor was of the opinion that, had nothing been done to assist in the

elimination of the poisons, decedent would not have lived
longer than from 1 to 3 days. He advised the use of hot
applications, with turpentine and fluids in the mouth; that
he be bathed with hot sponges twice daily, and afterwards
rubbed briskly with alcohol; that he be given two teaspoon-
fuls of digitalis every 2 hours, and Frazer's brandy, 3
ounces every 6 hours; a high rectal enema morning and
evening, with Epsom salts and 3 quarts of water; that, when
in pain, he be given ¼ grain and 1/150 grain of morphine
and atropine, not oftener than once in 8 hours; that he be
put on milk, water, soup, and broth, as a diet, and be given
"Bulgarian bacillus morning and evening, one tube in one-
half glass of water, sweetened, the bacillus being made from
buttermilk, and intended to reduce the germs in the intes-
tinal tract." He was then asked, after reciting some of
the matters mentioned, "Would or would not there be any
improvement in his condition and mental condition, without
relief, and without the treatments which you have de-
scribed, and which you have detailed to the jury?" and,
over objection, answered:

"There would be no improvement in his physical con-
dition; he would get worse. Q. How about his mental con-
dition? A. There would be no improvement in his mental
condition. Without that treatment his mental condition
would get worse. Without that treatment, his physical and
mental condition would remain about the same in 1, 2, or
3 hours as when I finished my examination. His mind was
impaired, due to his physical trouble."

He was then asked "whether or not, in your opinion, he
was, at that time, of sound or unsound mind?" and an-
swered, over objection:

"An unsound mind, due to the toxic condition of his
body. Q. State whether or not, in your opinion, he was
in such a condition of mind as to intelligently understand
the extent and value of his property. A. No. Q. State
whether or not, in your opinion, Mr. Henry was in a con-
dition of mind where he could intelligently realize the ob-
ligations which he was under to those next of kin to him.

A. No. Q. State whether or not he would be able, within the next 1 or 2 hours [after examination], to intelligently understand the nature and extent of his property, in the absence of treatment which you prescribed. A. No. Q. State whether or not, within a short time after you saw him, in an hour or two, he would, in your opinion, be able to understand intelligently and to realize the obligations which he was under to those next of kin to him, in the absence of the treatment which you prescribed. A. No."

On cross-examination, the doctor was asked as to his testimony on the previous trial, and if, in his opinion, decedent was of unsound mind, or did not appreciate his obligations and realize the extent of his property, if he made certain statements to the scrivener, and swore that he didn't believe "he was conscious of what he was doing when he signed the will;" that he didn't believe "that he was clear-headed as to what he was doing;" that the condition of his mind, within an hour or two after he saw him that morning, would be such that his volition would be impaired; that, on the morning of the 22d of December, when he saw decedent, and for 2 or 3 hours after that, his condition of mind was such that he could respond to suggestions, when aroused.

The evidence was in conflict as to whether this physician advised the decedent to settle his property; and, on further cross-examination, the doctor swore that, if the decedent made the statements with regard to his property and family, as testified to by the scrivener, he would not say that he did not have an intelligent knowledge thereof. Four physicians were called, and each, after qualifying, in response to a hypothetical question, accurately detailing the facts which the evidence tended to show, expressed the opinion that the decedent's condition did not materially change, within the times after Dr. Murphy examined him and when the will was signed; that he did not, at the time, appreciate the extent or value of his property, nor under-

stand the claims of his children to his bounty; and that, in their opinion, he was of unsound mind.

V. On the other hand, Dr. Dvorak, who accompanied Dr. Murphy, testified that he (witness) didn't examine him for arterial sclerosis, but knew he had it, to some extent, and that his temperature might have been two degrees more than normal; denied that his complexion was yellow; swore that Dr. Murphy did not take a sample of his urine, though Mrs. Dolan corroborated the doctor in saying that he did take it, and that the witness made an analysis, and found that it contained bile, but did not examine it for casts; was of opinion that bile in the urine was a sign of Bright's disease; agreed with Dr. Murphy as to the condition of the heart, but did not find any evidence of uremic poisoning; did not find him in a state of stupor, nor delirious. He testified, also, that the patient's liver was not larger than normal; that, when he entered the room on the 22d of December, with Dr. Murphy, the decedent inquired, "What are you two devils here for?" that Dr. Murphy obtained the history of the case from decedent; that they had no difficulty in understanding him; that he discovered nothing that indicated decedent to be of unsound mind; that, when he went out a second time, to take a nurse, he found decedent in the same condition as he had been when examined; that, when he and Dr. Murphy were there, besides talking of his sickness, decedent spoke of the weather, and inquired if it was very cold out; that Dr. Murphy did not take his blood pressure. The witness expressed the opinion that the decedent was of sound mind. The nurse, who arrived at 4 or 5 o'clock in the afternoon of the 22d, remained until the 26th of January following, and was of opinion that decedent's mind was all right. The scrivener, cashier of a local bank, swore that, when he reached decedent's bedside, the latter was not in a stupor; that he had a chat with him about a number of things; that testator told John to bring him his pocketbook, which was done, and, at the direction of his father, John handed the deposit slips and a passbook from it, and called attention to a certificate of deposit in

one bank in Cedar Rapids of $1,800, and a deposit slip in
another bank for that amount, and to the passbook, show-
ing a deposit of $2,500 in a local bank. There was also a
little money in the pocketbook. He further testified that
decedent then told him the names of his children and what
property he had, and, in response to inquiry, advised him
that he wanted John and his boys to have the land as long
as they lived, and wanted it fixed so that it could not be
mortgaged or sold, and the personal property and money
were to be divided among the girls, Nellie's portion to be
held in trust, $500 to be set aside for Willie in trust, and
he was to have the use of it only; that Willie had never
been at home or helped any there, and that Nellie had no
children; that he did not wish Harrington to get any of his
money; that he then repeated the arrangement, and asked
decedent if it was right, and, upon response in the affirma-
tive, proceeded to draw the will; that he told decedent that
he could place Nellie's portion in trust, so that she could
have the use of it, and so that it would go to the children
after her death, and the same way with Willie's; that he
read the will over to decedent, and that he approved it;
that he was not sleepy or drowsy, and the witness had no
difficulty in understanding him; that his complexion was
normal, though he was suffering more or less pain; that
witness was there until about 11 o'clock in the forenoon;
that decedent referred to his undivided portion of the 160
acres as the south 70 acres of the home farm; that decedent
couldn't read or write; that the witness "suggested to Mr.
Henry that he put whatever he was going to give Mrs. Horri-
gan, in trust;" that he suggested "that he put Willie's share
of $500 in trust;" that testator so did, saying that Nellie
and Willie would have something, and the suggestion suited
him; that decedent did not say how much corn he had in
the elevator, but said he had some notes, but not how many.
Several witnesses testified that they had conversations with
deceased, at about the time in question, and that, in their
opinion, the decedent was of sound mind; and two of them

stated that they had heard decedent say, shortly before, that he wanted John to have all the land.

This is substantially all the evidence adduced. Necessarily, many of the details have been omitted, and possibly some of importance. Enough has been set out, however, to indicate that the cause should have been submitted to the jury. In the first place, the terms of the will were such as to suggest an unbalanced mind as its author. The weight to be accorded to such a circumstance, in passing on the issue, necessarily depends on the variance of the terms of such will from those which might and ordinarily would be expected in the will of an ordinarily just and prudent person in a like situation. There is also evidence from which the jury might have found that decedent had been in failing health for at least two years, and frequently had been drowsy, as would be likely, were he afflicted with the diseases described by Dr. Murphy. So, too, the jury might have concluded that, on December 22, 1919, the decedent was suffering great pain, was afflicted with gas accumulations in the stomach, and possibly further down; that he was in somewhat of a stupor, until he had been relieved by the application of hot water and turpentine in the afternoon, subsequent to the signing of the purported will. Of course, there was evidence to the contrary, but the conflict therein was for the jury to determine. And finally, the expert testimony of Dr. Murphy, in connection with the other evidence, warranted the finding that decedent was not of sound, disposing mind, at the time the so-called will was signed. This physician expressed the opinion that the decedent was of unsound mind when he examined him, and 1 or 2 hours thereafter, and that he did not believe he was capable of making his will, at the time the same was signed. The evidence of four physicians, in answer to hypothetical questions, tended to confirm Dr. Murphy's opinion. True, Dr. Dvorak controverted many of the statements made by Dr. Murphy, and was of different opinion; but the controversy was for the jury, and it was for that body to say whether they would accept the testimony of Dr. Murphy

or of Dr. Dvorak. The appellee contends that there was
no evidence of unsoundness of mind at the very time the
will in question was made; but, in so doing, they overlooked
the opinion of Dr. Murphy that decedent did not have ca-
pacity to execute a will within 2 hours after his examination
of the witness, and that the will was signed within that
time; and also, they seem to have ignored the testimony of
Mrs. Horrigan, that her father was in a stupor when she
arrived, subsequent to the time when the will was signed.
And there was other evidence that his condition was the
same up to about 1 o'clock, when he seemed somewhat re-
lieved by the hot applications. In argument, it is assumed
that the scrivener's testimony concerning what the decedent
said to him about his family and property is to be accepted
as true; but whether so, under the circumstances, was a
matter on which the jury must have passed. The testimony
of the daughters tended to refute the statements of the
scrivener as to decedent's condition, and as the scrivener
was alone with him, most of the time while there, appel-
lants necessarily relied upon the testimony of the daughters,
as well as the opinion of Dr. Murphy, tending to put the
scrivener's testimony in issue. See *Womack v. Horsley,* 178
Iowa 1079. Were it to be assumed that the testimony of
the scrivener was, in all respects, correct, little would be left
to determine. The physicians admitted that, if the dece-
dent's alleged statements to the scrivener concerning his
property and family were made, they could not say his
mind was unsound. This would not necessarily impair their
testimony that, in the absence of such statements, in their
opinion his mind was unsound. In other words, the jury
was not required to accept what the scrivener said, but
might have relied upon the testimony of his daughters as
to his condition during the time the scrivener was present
and thereafter, and Dr. Murphy's opinion, in substance, that
he was without testamentary capacity for at least 2 hours
after the doctor's departure. Though the diseases from
which decedent was suffering were progressive in their
nature, the evidence leaves no doubt that he was possessed

of testamentary capacity up to the time he was taken sick, and that he so far rallied under treatment as to recover from the temporary stupor, if any there was, with which he was afflicted. Appellee contends that the testimony of experts, based on facts occurring at times other than when the will was made, is insufficient to establish the fact of mental unsoundness at the time of making the will. The ruling in *Womack v. Horsley,* 178 Iowa, 1079, is to the contrary, and the decisions relied on do not so hold. What is held in *Blake v. Rourke,* 74 Iowa 519, *Speer v. Speer,* 146 Iowa 6, and other decisions, is that a nonexpert may not express an opinion of the condition of the mind of a person under consideration at a time other than when seen. The rule is as laid down in *State v. McGruder,* 125 Iowa 741, that:

4. EVIDENCE:
duration of
condition
of mind.

"A nonexpert may not express an opinion concerning mental condition of the subject of investigation, save at the times of his observation, and the question propounded to McGruder was so limited; but an expert, as Dr. Garton appeared to be, may be permitted to express his opinion, not only of the condition of the mind at the time of the examination, or that fixed by the hypothetical question, but concerning its probable duration, past and future, and whether it existed on a particular day."

A finding that decedent did not have testamentary capacity when the will was signed, might have rested on Dr. Murphy's opinion that he was of unsound mind when he saw him, and that he would not sufficiently recover so to do within a time including that when the will was signed; the testimony that decedent told the scrivener that he did not know how much property he had; that his eyes were closed, at least part of the time the scrivener was there; the testimony of the daughters, that he was not relieved until after 1 o'clock in the afternoon of that day; and Mrs. Horrigan's testimony, that he did not seem to recognize her when she came (after the will was signed), and that he then seemed to be in a stupor. We are of opinion that the

court erred in directing a verdict for proponents.

VI.   Mrs. Dolan was asked this question: "Excluding anything that you said to your father that night, or anything he said to you, state whether or not your father was delirious."

5. WITNESSES: transactions with deceased.

An objection as incompetent, irrelevant, and immaterial, and calling for a conclusion, and that the witness was incompetent, under Section 4604 of the Code, was sustained. The question did not call for any transaction or communication between the witness and decedent, and, therefore, she was not incompetent to testify.   Evidence of his condition the night before the will was prepared and signed surely would have some bearing on the issue as to mental condition in the forenoon following. Whether he was delirious could be determined only from his speech and conduct, and, therefore, was in the nature of a conclusion; but a conclusion of fact, which might not be otherwise proven.   The facts indicating that he was delirious could not well be reproduced or described to the jury precisely as they appeared to the witness, and, for this reason, under a well-established rule, the witness should have been permitted to answer the question.   See *Vannest v. Murphy*, 135 Iowa 123; *Stewart v. Anderson*, 111 Iowa 329; *Ewing v. Hatcher*, 175 Iowa 443; *Mikesell v. Wabash R. Co.*, 134 Iowa 736; *Kesselring v. Hummer*, 130 Iowa 145.

"It is competent for a witness to testify to his conclusion, when the matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time."   *Yahn v. City of Ottumwa*, 60 Iowa 429.

The same witness was asked:

"Now, after midnight, after he quit vomiting, as you stated, just describe his appearance from that time until after your sister Maggie came. A. He talked in an incoherent manner, and was muttering."

This was stricken out, on motion, as not responsive, and as incompetent, under Section 4604 of the Code, and as opinion and conclusion of the witness.   Though not respon-

sive, the examining counsel only might complain on that ground. As no communication to or with, nor transaction with, decedent was involved, she was not incompetent, under the section of the Code referred to; and, under the ruling above, the answer was not objectionable as conclusion, and it should not have been excluded.

Other rulings of like nature are disposed of by what has been said. Because of not submitting the issues to the jury, the judgment is—*Reversed.*

WEAVER, C. J., GAYNOR and STEVENS, JJ., concur.