VERN H. HANN, Appellant, v. FRANK W. HANN, Appellee.

**WILLS: Undue Influence—Rule of Sufficiency.** Undue influence, in order
1 to be sufficient to overthrow a will, must take such form and be of
   such nature that the will of the wrongdoer is *substituted* for the
   will of the testator.   The mere presence of the devisee (a husband)
   in the room when the will was executed, and the fact that the
   testator had made a former will, more advantageous to the con-
   testant, are not sufficient to establish undue influence.   (See Book
   of Anno., Vol. 1, Sec. 11846, Anno. 168 *et seq.*)

**WILLS:  Testamentary Capacity—Opinion Evidence—Usurping Jury**
2 . **Function.**   No witness, expert or otherwise, in testifying to matters
   bearing on the soundness or unsoundness of mind of the testator,
   must be permitted to testify to the existence or nonexistence of *the
   very facts which the jury must determine.*   (See Book of Anno., Vol.
   1, Sec. 11846, Anno. 72 *et seq.*)

**WILLS:  Testamentary Capacity—Opinion Evidence—Nonexpert Detail-**
3 ing **Physical Condition Only.**   A nonexpert witness may not give
   his opinion as to the unsoundness of *mind* of a testator on a recital

of facts which pertain solely to testator's *physical* condition. (See Book of Anno., Vol. 1, Sec. 11846, Anno. 99 *et seq.)*

Headnote 1: 39 Cyc. p. 681; 40 Cyc. pp. 1144, 1165, 1322. Headnote 2: 40 Cyc. pp. 1037, 1040, 1041. Headnote 3: 22 C. J. p. 603; 40 Cyc. p. 1038.

Headnote 1: 28 L. R. A. (N.S.) 288; 28 R. C. L. 147. Headnote 2: 11 R. C. L. 593. Headnote 3: 11 R. C. L. 606.

*Appeal from Shelby District Court.*—J. S. DEWELL, Judge.

DECEMBER 14, 1926.

An action to set aside the probate of a will. At the close of appellant's testimony, the court sustained a motion to direct a verdict in favor of appellee. Plaintiff appeals.—*Affirmed.*

*R. F. Swift* and *Tinley, Mitchell, Ross & Mitchell*, for appellant.

*Thomas H. Smith* and *Bennett Cullison*, for appellee.

ALBERT, J.—Ida L. Hann and Frank W. Hann, appellee herein, were wife and husband, and Vern H. Hann, appellant, was their son. Ida L. Hann died on the 31st day of January, 1924,

1. WILLS: undue influence: rule of sufficiency.

and the will in controversy was duly probated on March 4, 1924. This action was commenced on the 2d day of February, 1925, to set aside probate and declare the will void on the ground of mental incapacity of the said Ida L. Hann, and undue influence exercised over her by her husband, Frank W. Hann. Two motions were made at the close of plaintiff's testimony: The first, to withdraw from the consideration of the jury the question of undue influence, on the ground that there was no evidence to warrant submission of such issue to the jury; the second, to direct a verdict for defendant, the substance of which was that there was not sufficient evidence to go to the jury on the question of mental incapacity of the said Ida L. Hann. Both motions were sustained by the court, and judgment entered accordingly. It is the rulings on these motions that are assigned as errors. Other assignments of error go to the question of admission or rejection of testimony.

The first question discussed is the sustaining of the motion withdrawing from the consideration of the jury the question of undue influence.

The quantity of evidence necessary to take this issue to the jury has been a question of extended discussion in our former cases. We have definitely fixed these rules, however, in the case of *In re Will of Richardson*, 199 Iowa 1320, at page 1327, where we said:

"Influence, to be undue, within the meaning of the law, must be such as subjects the will of the testator to that of the person exercising the influence, and makes the written will express the purpose of such person, rather than that of the testator. It is frequently said that it must be equivalent to moral coercion, and directly connected with the execution of the will, operating at the time it is made. *Perkins v. Perkins*, supra [116 Iowa 253]; *Parker v. Lambertz*, 128 Iowa 496; *Henderson v. Jackson*, 138 Iowa 326. The person charged with exercising undue influence need not have been personally present when the will was made, but his influence must have been actively operative [citing cases]. Undue influence is not established by proof of opportunity to exercise it and a disposition to do so [citing cases]. Importunity, requests, and persuasion that do not go to the point of overthrowing the will of the testator, are not sufficient to constitute undue influence [citing cases]."

We turn now to the evidence in this case. It is impossible to set the record out in full, because it would make too lengthy an opinion. Among others, the following facts are established by appellant's testimony: Until 1922, the testator was a strong, active woman, and took an active interest in the affairs of life, but in that year she became afflicted with cancer of the uterus. Prognosis of her trouble was bad, and the disease was progressive to the time of her death. In December, 1922, she executed a will, which, in substance, gave to her son, appellant herein, a 240-acre tract of land during the natural life of the son and his wife, and at the death of the survivor, to the children of appellant. The husband owned certain lands in which the testator had an interest, and by will she released to her husband her interest in the lands thus owned by the husband. On January 4, 1923, a codicil was added to this will, by which she confirmed the will and provisions therein, and also devised and bequeathed to

the son, Vern, "all her right, title and interest in and to the estate of Mary A. Goddard, deceased, whether this property consist of real or personal property, or whether it be moneys and credits."

On January 4, 1924, she executed the will in controversy, the material part of which is that she gave to the husband, for a period of five years from her death, the use of an 80-acre tract of land, subject to which use by the husband she devised said tract to appellant herein. All the rest, residue, and remainder of her property, of every kind and description, she devised and bequeathed to her husband, Frank W. Hann. She further explains this devise and bequest by saying:

"Feeling that he will make such provision for my son as future conditions warrant, but I want it expressly understood that the provision herein made for my husband is absolute and not in trust."

The relations between mother and son seem to have been friendly and affectionate at all times. We glean from the record the following prominent points that might be considered on this question of undue influence: The will was drawn by the late Judge Cullison on the 4th day of January, 1924, 27 days before the death of the testator. The husband, Frank W. Hann, called Judge Cullison to the home to draw the will, and was present in the room when the same was executed by the testator. There is no evidence whatever that Frank Hann had anything to do with the preparation of the will, or in any way dictated the terms or provisions thereof.

Dr. Bocken was testator's attending physician. He began treating her December 6, 1922, and continued so to do until the time of her demise. He testifies to the progressiveness of the disease, wearing of the disease on the system; that the disease carried with it a toxic effect which affected the blood and would affect the organs of the body. He said that toxin in the blood would injure the brain and be detrimental to it; that at times he observed testator in a stupor, and she suffered pain, and morphine was administered to her whenever she needed it, to quiet her. As the disease progressed, he noticed a yellowish color, and there was loss of flesh and loss of weight. He testifies further that disease of the female organs would be likely to, or probably would, indirectly affect, to some extent, the mind or brain. He

was present on the 4th of January when the will was made, and
signed the will as a witness, although he said he did not know it
was a will.  No other witness testifies who was present at the
time the will was made, Judge Cullison having died in the
interim.

These are the high points in the testimony on the question
of undue influence.  Measured by the rule we have heretofore
cited in *In re Will of Richardson*, 199 Iowa 1320, this was not
enough to take this question to the jury.  While it is true that,
under some circumstances, undue influence may be proven cir-
cumstantially, as well as by direct testimony, yet we do not think
that this is a case for an application of the rule permitting proof
by circumstantial evidence.  It will be noticed that the principal
point here was that the husband was present in the room at the
time the will was drawn.  This fact cannot weigh very heavily,
because, as husband of the testator, his presence in the room at
the time the will was drawn does not bear very much significance.
The fact also that she had previously made a will, giving the
larger part of her property to her son, and by the last will ma-
terially reduced the bequest to the son, cannot be said to be very
persuasive on the proposition of undue influence.  It is, of course,
a circumstance to be considered, with the other circumstances in
the case, on the question of undue influence.  Taking these facts,
with the fact that the relationship between the mother and son
was always friendly and affectionate, and also taking into con-
sideration the evidence of her physical and possibly weakened
mental condition, we do not think that there was enough to take
this case to the jury; and the court was right in withdrawing the
issue of undue influence from the jury.

The other question raised is whether or not the court was
warranted in directing a verdict in favor of appellee on the
question of mental incapacity.  This is always a troublesome

2. WILLS: testa-
mentary capaci-
ty: opinion evi-
dence: usurp-
ing jury func-
tion.

question in cases of this character.  Some con-
trolling questions must be determined before we
give attention to testimony on this question: The
attending physician, whose testimony has been
heretofore referred to, at no place testifies directly that the testa-
tor was of unsound mind at the time of the making of this will.
There was a series of questions asked of this witness and also of
each of the other witnesses on the part of appellant, to which

due objection was made at the time, and in most instances, the objection was overruled by the court; and to these we give attention. The questions referred to the time of the making of the will. · The doctor was asked whether this woman had sufficient mental capacity to understand and comprehend the nature of the act of making a will, and the effect that the will would have upon her property at her death; also, whether she had sufficient mental capacity to understand and know the effect that the will would have upon her property, if she should make one; also, whether she had sufficient mental capacity to know and comprehend the effect of a will upon her property after her death; also, whether she had sufficient mental capacity to comprehend and realize her property, and know the extent of her property; also, whether she had sufficient mental capacity to comprehend and realize the natural objects of her bounty and the duty she owed, if any, to the natural objects of her bounty." The objection to each of these questions should have been sustained. Each question went to the very question the jury had to decide. The last time we had this question before us, as we now recall, was in *In re Will of Jahn,* 184 Iowa 416, where this question was elaborately discussed, and it was held that all questions of this nature were inadmissible, and that to admit answers to them was prejudicial, even though they came from a physician. To permit the witness to answer such a question is an invasion of the province of the jury, and leaves nothing for the jury to decide. The usual and ordinary form of this question is to ask the witness whether or not, in his opinion, the testator, at the time, was of sound or unsound mind. · In the consideration of this case, we therefore will exclude from our consideration the testimony of all witnesses where they were permitted to answer the above question or questions of a similar character.

In addition to what has already· been referred to in the testimony of Dr. Bocken, he says:

"During the months of December, 1923, and January, 1924, her strength declined. At the latter time, she could not get out of bed alone, and could only reach a sitting position by assistance of someone. In January, 1924, she seemed apparently as talkative as always, and at other times not so much. I observed her in stupor at different times. She depended on aspirin a great deal, and on morphine to relieve her pain. My direction to the

nurse was to administer it whenever needed for the pain. Was called about 2 o'clock on the morning of January 4, 1924. She was sitting in a chair, and I talked to her, and she remarked that she feared to talk death. She said that, if she would lie down, her heart would stop, and that she would die from a heart condition. She was very weak, and could not get her to bed. Gave her a hypodermic of digitalis and strychnine and some morphine, the digitalis and strychnine to relieve the heart, and the morphine to relieve the fear. At times, she would be on her hands and knees in bed, for the simple reason it would be more comfortable for her. I left her sitting in a chair."

On cross-examination, he testifies that he was there at the time of the making of the will; that he examined Mrs. Hann, and told her to continue her treatments; that she talked to him. He was asked, when he concluded, whether she was mentally able to understand these things, and he answered:

"I hadn't given it a thought, at the time, or for months afterwards, because it didn't concern me."

He was asked just how much mental force a person would have to have, to make a will, and he answered, "I cannot answer that."

"Q. Would you have to have as much as to carry on business? A. Yes, sir. Just the same mental capacity as to carry on business. I understand that he would have to be able to carry on a business successfully, in order that he might be capable of making a will. If there was anything wrong with her mental thinking and reasoning, it was because of her physical condition. Q. Just how much physical weakness does a man or woman have to have, before they lose their mental equilibrium? A. I think a state of delirium or delusions. She was not delirious in the afternoon. In a person afflicted with cancer, the toxemia would affect the mind to the extent of delirium and delusions. She had had delusions. The longer the cancerous condition existed, the more toxic it became. It varies as to the location of the cancer and the amount of absorption. Giving of morphine does not affect the mind. The toxemia is an effect on the blood. She had an anæmic condition. Such conditions affect the brain. [The will was made in the afternoon.] She had some morphine in the morning."

William Goddard testified that he saw the testator in De-

cember, 1923; that she was very weak and thin; that he again saw her in January, about a week before she died; that she was not as talkative as she naturally was.

"I did not talk much to her. There wasn't much color in her face, and she looked thin. She was lying in bed in December, 1923. She seemed very weak, but was not unconscious. Had conversation with her in December, 1923. Asked

3. WILLS: testamentary capacity: opinion evidence: nonexpert detailing physical condition only.

her how she was feeling, and she replied she was not feeling very well. That was not all the talk I had at that time. I talked with her at other times. I don't recall what we talked about. She said nothing about business. She sometimes made exclamations of pain; cannot recall what she said."

Here followed the series of questions referred to in the former part of this opinion, about the sufficiency of her mental capacity. This witness was a non-expert witness, introduced for the purpose of showing the mental incapacity of the testator. We have repeatedly announced the rule that, under such circumstances, the witness cannot be permitted to give such testimony without first reciting the facts upon which he bases his proposed opinion. Our cases on this proposition have been gathered and commented upon in the case above cited, *In re Will of Richardson*, and need not be set out herein. More than this, a witness, in attempting to give such an opinion, must testify to such set of facts as a basis therefor as that it may fairly be inferred from such facts that there was mental unsoundness. As applied to the facts of this witness's testimony, each and every fact as to the condition of this woman to which he testifies, refers purely to her physical condition; and none of the facts he recites, nor all of the facts combined, could be the basis even of an inference that her mental condition was not normal.

Mrs. C. H. Dean testifies that she was a graduate nurse, and cared for Mrs. Hann for nine or ten days; that Mrs. Hann was not in very good condition, was white and pale, of a yellowish color; that she was in bed.

"We took her up and put her in a chair, and then back to bed; and she was not up after that. There was quite an odor incident to her disease, and a bad discharge. Gave her opiates according to her pain, sometimes every four hours. She cried some, and was most of the time delirious, and unconscious at

times; at other times not. Delirium sometimes lasted half an hour, and sometimes more."

This same set of questions heretofore referred to, as to Mrs. Hann's mental capacity, was asked the witness, but in this instance the objections were all sustained. The witness further testified:

"I went to the Hann place either the 21st or 22d of January, and was there until she died."

She was there after the will was drawn, and her opinion is subject to the same objection as that of the witness Goddard.

Reverend Metcalf, a Congregational minister, testifies:

"First met Mrs. Hann in October, 1923. Was there ten or fifteen minutes. She was yellowish-white color; her eyes were prominent; she was emaciated. Had a conversation with her which was of a generally spiritual nature. Was there several times after that, sometimes every other day. Saw her when she was delirious. She had slight flights of delirium every time I called. She would talk one thing and then another, thinking around, not holding her mind to one subject. She knew what she was talking about, but nothing definite. Saw her in the early part of January. Could not say whether she was in delirium then or not. Am not sure whether I saw her between the 1st and 4th of January or not. Almost sure I did. Her eyes were stars. Observed an odor on all occasions I was there. It is rather difficult to describe her talks. Sometimes they were rather short, and sometimes she would talk of her sickness, hoping to get well, and then she felt she was going."

This witness was then asked the series of questions hereinbefore referred to, as to the mental capacity of Mrs. Hann, and was permitted to answer, over objection. On cross-examination, he says:

"I don't think she was a normal person. Never talked to her about her property. She talked to me about her spiritual condition. She did not go into her business relations. She was very sick, and was not capable of carrying on her business. That is all I do mean."

Vern Hann, appellant, testifies that he was married in April, 1917. Up to that time, he lived on the farm with his parents. Before his mother became sick, she was active and strong, and took care of practically all the business. Before she was taken

sick, she weighed around 145 pounds. In 1923 and 1924, the witness stayed at Harlan, and his father and mother came to live with them, where they lived until the date of the mother's death. He was working, at the time, and was home evenings and mornings. His wife worked for the telephone company. She was home mornings, noon, and evenings, and had her meals. On the morning of January 4, 1924, his mother was attacked with shortness of breath. Dr. Bocken was called. He administered a hypodermic. The witness further testifies that the mother was then sitting in a chair, where she had been carried to the door for fresh air; that he ate breakfast about 6:30 in the morning, and went to his work, and was back at noon; that she was still sitting in a chair; that he was there about 30 minutes at noon, and arrived home in the evening about 6:30; that she was still sitting in a chair; that his mother's eyes were very glassy; that in the evening they were very dull. He was then asked the series of questions above referred to, as to her mental capacity, and was permitted to answer. This witness was asked whether or not, in his judgment, the testator, on the 4th day of January, 1924, was of sound or unsound mind, and he answered, "I don't think she was of sound mind." He, being a non-expert witness, and testifying to no facts that in any way indicated the condition of his mother's mind, was not competent to so answer, under the rule we have heretofore announced. On cross-examination, he testifies that what he meant in his answer to the aforesaid question was that his mother was not able to take hold and carry on business.

Mrs. Vern Hann testifies that she was the daughter-in-law of the deceased and the wife of appellant.

"I noticed my mother-in-law was delirious about the 1st or 3d of January. She did not eat much of anything, or care therefor. She would drink a cup of coffee. She was carried to the table in a chair. I remember the 4th of January, when somebody sent for Dr. Bocken about 2 or 3 o'clock in the morning. I observed Mrs. Hann and her breathing. She moaned some in the morning. Observed her countenance, color, and eyes. She had no color in her face; she was kind of greenish yellow, and her eyes were glassy. Picked her up and took her to the door for a few minutes. I left home about 7:45. When I left, Mrs. Hann was sitting in a chair by the register. When I came back at noon,

she was still sitting in a chair. I was there about 30 minutes. When I reached home in the evening, she was still sitting in the chair. Her eyes were wally. She seemed awfully nervous."

She was then asked, basing her judgment on what she testified to, whether Mrs. Hann was of sound or unsound mind at these three times (morning, noon, and evening of January 4th). She answered, "I don't think she was of sound mind." She had recited no fact relative to the mental condition of said testator on which she could base this opinion. She was then asked the four questions above referred to, as to the mental capacity of the deceased, and was permitted to answer the same.

Marie Pierce, a nurse who alternated with Mrs. Dean, and who had charge of Mrs. Hann five days before she died, testified that Mrs. Hann was delirious in the daytime and in the nighttime, practically all the time.

"Her eyes were glassy. There wasn't any color in her face. She had a yellowish-white cast. At that time, she was getting morphine every four hours, and more often if needed."

She testifies that she did not think that the testator was of sound mind. This, of course, has to do only with the few days that she took care of Mrs. Hann before her death. She also answered the line of questions heretofore referred to.

This is the sum total of the testimony introduced on behalf of appellant. To our minds, it is not sufficient, after the exclusion of that which was wholly incompetent, to take the case to the jury. The ruling of the district court in sustaining the motion to direct the jury to return a verdict in favor of appellee was right.—*Affirmed.*

DE GRAFF, C. J., and EVANS and MORLING, JJ., concur.